**UNITED STATES of America,
Plaintiff,**

v.

**Madonna Mae GILBERT et al.,
Defendants.**

**No. CR 73-5019.**

United States District Court,
D. South Dakota, W. D.

March 14, 1974.

On Motion for Judgment of Acquittal for Lack of Jurisdiction May 25, 1974.

---

**84**

Edward Carpenter, Asst. U. S. Atty., Joseph M. Butler, Rapid City, S. D., Carleton R. Hoy, Sioux Falls, S. D., for plaintiff.

John E. Thorne, San Jose, Cal., Albert J. Krieger, New York City, Joseph Beeler, Chicago, Ill., James M. Shellow, Milwaukee, Wis., John S. Connolly, St. Paul, Minn., for defendants.

## MEMORANDUM OPINION ON MOTIONS TO SUPPRESS

URBOM, District Judge, Sitting by Designation.

Warrantless searches of and seizures from an International Travelall at a road block near Wounded Knee, South Dakota, on the Pine Ridge Indian Reservation. on the first night of the February, 1973, difficulty at that village are the subject of the motions to suppress evidence now before the court. The motions seek to prevent the use in a prosecution for burglary and larceny of various items removed from the vehicle.

From an extensive suppression hearing I find the facts set out in this memorandum, although I recognize that there is variation in the testimony at. some important points. A careful listening to the witnesses, considering the respects in which the testimony of each is supported or contradicted by testimony of others and weighing the credibility of each, lead me to these factual findings. Applying them to the applicable legal conclusions, I conclude that the motions to suppress evidence must be denied.

### INVESTIGATIVE STOP

The Travelall and a 1963 Ford automobile were stopped for identification purposes by Darwin Coats, a Tribe policeman, at approximately 11:00 p.m. on February 27, 1973. Almost immediately after the vehicles were stopped, an F.B.I. car occupied by F.B.I. Special Agents Larry McGee, Merrill Sherer, and James W. Dick, and a Bureau of Indian Affairs policeman, Sergeant Fred Two Bulls, arrived where the two vehicles had been stopped and shortly thereafter the first search of the Travelall was conducted by McGee.

A few days before February 27, 1973, Special Agent McGee had been assigned

to Rapid City, South Dakota, to investigate an incident at Custer, South Dakota, and the activities of the American Indian Movement. On February 27 he went to the Pine Ridge Indian Reservation and he and Special Agent Sherer were directed by their superior, Special Agent in Charge Trimbach, to observe activities at Calico Hall, which was in a settlement at least 15 miles west of Wounded Knee and at least 22 miles west of the place where the stopping of the Travelall occurred. In the early evening McGee noted that a caravan of cars left Calico Hall and drove into Wounded Knee, some of them carrying red banners signifying a connection with the American Indian Movement. He and the other F.B.I. agents heard shooting from Wounded Knee. He and the other officers were informed by police officers that the Trading Post at Wounded Knee had been broken into by armed people and "had been taken over," that looting had occurred, and that hostages were being held. The three agents and Sergeant Two Bulls were assigned to set up a roadblock north of Wounded Knee. En route to that position by a circuitous route which put them on a north-south road about seven miles east of Wounded Knee, Special Agent Dick saw the headlights of the Travelall and the Ford approaching from the north, traveling south. As the vehicles passed, he recognized the Travelall as one he had seen on previous occasions in Rapid City, South Dakota, and on February 27, 1973, at Calico Hall. He orally relayed that information to the driver of the automobile in which he was riding, whereupon the car turned around and followed the Travelall and the Ford at a moderate speed.

At the junction at which southbound vehicles either could jog slightly to the east and proceed south or could turn east and continue proceeding east, or could proceed west into Wounded Knee, the Travelall, which bore out-of-state license plates, and the Ford were stopped by Coats, who had been stationed there to check out-of-state cars and had been told by radio from the Bureau of Indian Affairs police headquarters to be on the lookout for an International Travelall. Coats had begun to ask the driver of the Travelall for identification when the car carrying McGee and the three other officers pulled up to the scene. McGee and Sherer went to the Travelall and Dick to the Ford. At the passenger side of the Travelall McGee identified himself to the occupants of that vehicle and looked through the open right rear window of the Travelall, where he saw a revolver lying on the floorboard immediately behind the front seat and saw in the cargo space immediately behind the rear seat a large club bearing the letters AIM. The Travelall was occupied by the defendants, Miss DeCora—who now is Mrs. Means—and Miss Gilbert being in the front seat and Miss Ackerman in the back seat.

McGee ordered the defendants out of the Travelall and McGee stated in a tone loud enough that it was heard by each of the other agents and Sergeant Two Bulls that there was a gun in the Travelall. The defendants were then ordered to the front of the vehicle, where a pat search revealed no weapons on them. Approximately simultaneously with McGee's approaching the Travelall, Dick moved to the driver side of the Ford, identified himself to the two occupants, a man and a woman, heard McGee say that there was a gun in the Travelall, ordered the occupants of the Ford to alight, searched their persons, and communicated orally to McGee that they were not armed. McGee, Sherer, Dick, Two Bulls, and Coats were armed.

Immediately after the pat search of the occupants of the Travelall, McGee returned to the passenger side of the Travelall and reached inside the vehicle, picked up the revolver, and while reaching in saw in the cargo space immediately behind the back seat two wooden clubs, a large wooden object, and the barrel and magazine of a rifle. One of the clubs was about three feet long and two inches in diameter and one was a maul handle or axe handle about 36

inches in length. The large wooden object proved to be a rolling pin, which he could see in its entirety before picking it up, but only after picking it up and looking at it more closely did he notice it had a price tag on it from the Trading Post at Wounded Knee. He seized and removed from the Travelall each of the foregoing items. The revolver was placed, at least momentarily, on the roof of one of the cars and later put in the trunk of the F.B.I. car.

Radio communication was then had to Special Agent in Charge Trimbach, who directed that the occupants of the Ford and the Travelall be arrested for burglary and larceny. All were then formally arrested.

█ In my view, the circumstances as they existed immediately before the stopping of the vehicles were sufficiently suspicious to permit Coats to stop the vehicles merely for identification and questioning within the doctrine of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968). McGee's assumption of the identifying of the Travelall occupants was not unreasonable. See Orricer v. Erickson, 471 F.2d 1204 (C.A. 8th Cir. 1973).

█ The scope of a search incident to an investigative stop is severely limited. An officer permissibly may make "a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." Terry v. Ohio, supra, at p. 30. The area within the reach of an occupant of a vehicle may also be searched if the officer has reason to believe that the occupant is armed and dangerous. Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The test is an objective one: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Terry v. Ohio, supra, at pp. 21–22.

█ Here, McGee's going to the passenger side of the vehicle, identifying himself, and looking into the back seat area, where Miss Ackerman was sitting, were entirely appropriate. In plain view he saw a revolver at her feet. In Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), the court said:

> "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence."

The seizure of that revolver was reasonable, even though the occupants of the vehicle had been placed in a position outside the vehicle and several feet from the vehicle at the time of its seizure. McGee knew when he went to the Travelall to retrieve the revolver that there were four other law enforcement officers on the scene. He did not know exactly, although he knew generally, where each of them was. He did not know exactly where the two occupants of the 1963 Ford were. It was dark; there were ten persons in the immediate vicinity of the intersection; a red light was flashing from atop one of four vehicles; two floodlights shown from atop Coats' car, although not aimed at the other vehicles; some movement of persons was occurring; and there was some confusion. Measured by the standard of what a reasonable person would consider appropriate, it appears to me that McGee reasonably could conclude that there was a danger to himself or another officer from the revolver which lay on the floor of the Travelall and the club which he had seen in the cargo space. He therefore was justified in proceeding to take temporary custody of those items. United States v. Pleasant, 469 F.2d 1121 (C. A. 8th Cir. 1972); United States v. Cecil, 457 F.2d 1178 (C.A. 8th Cir. 1972); United States v. Wickizer, 465 F.2d 1154 (C.A. 8th Cir. 1972). In the process of doing so he saw other weapons or items which could be used as weapons—another club, a rifle, and a rolling pin. They too were reasonably near at hand to anyone who might might make his or her

way to the Travelall. Although the defense argues strenuously that neither the clubs nor the rolling pin could reasonably have been considered by McGee to be a danger to himself or any other officer under the circumstances, I am not so persuaded. A reasonable person might well consider it appropriate to take possession of the rolling pin. Weapons other than guns were anticipated by the writer of the opinion in Terry v. Ohio, supra, as being proper items for seizure. As the court said:

> "The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, supra, at p. 29.

## PROBABLE CAUSE TO ARREST AND TO SEARCH

■ In justifiably taking possession of weapons and other items which could be used as weapons, including a rolling pin, it cannot be beyond the realm of propriety for an officer to look at the exterior of those items. McGee did that and saw a price sticker on the rolling pin which identified it as coming from the Trading Post at Wounded Knee. Suspicion thereby ripened into probable cause to arrest and to search the vehicle for instrumentalities, fruits, and evidence of crime. See Orricer v. Erickson, supra; United States v. Parham, 458 F.2d 438 (C.A. 8th Cir. 1972); United States v. Harflinger, 436 F.2d 928 (C.A. 8th Cir. 1970). The determination of probable cause is a matter of probabilities, rather than certainties. As stated in Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949):

> "These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." 338 U.S. at 176.

The search and seizure of items by McGee at the roadblock were reasonable and were not a violation of the defendants' constitutional rights.

It is argued by the defense counsel that the evidence dictates a conclusion that the mind-set of McGee and the other officers at the roadblock was such that they were determined to make a search for evidence of crime, irrespective of the existence or nonexistence of probable cause. Two answers are applicable.

■ First, even if that were true, the standard for a valid search is that of a reasonable person viewing the facts objectively, not merely the subjective mind-set of the searching officers. Second, a conclusion that the described mind-set dominated the officers, and particularly McGee as the searching officer, would not be based upon the preponderance of the evidence. McGee was —and the other officers were—apprehensive, tense, and probably ready to believe that the Travelall carried the fruits of the looting of the Trading Post at Wounded Knee, and acted swiftly to make an investigative stop. But he did nothing more than that until he saw weapons in the vehicle and moved to take them; even after he took all the weapons or potential weapons into his custody, he made no exploratory search

for loot from a larceny. That search was made later by Special Agent Price.

To the degree that McGee's eagerness to stop the vehicle and readiness to believe the occupants were participants in criminal activity affect his credibility, I consider the fulcrum to be whether McGee saw the revolver and the club before he reached into the Travelall. Despite the dimness of the light, I am persuaded that he did see them while he stood beside the open window immediately upon identifying himself. Every person at the scene who testified—all five officers—said that they heard him declare that there was a weapon in the Travel-all. That supportive evidence is critical and cannot be disregarded. Such a spontaneous declaration by McGee, which later proved to be accurate, carried the likelihood of bearing witness to an actual observation. Having seen the gun, he was justified in getting it. In getting it he was entitled to see what he could see, including other weapons, which in this instance bore evidence of connection with criminal activity at Wounded Knee.

## SEARCHES AT THE BIA POLICE BUILDING

After McGee's partial search at the roadblock, the Travelall was driven to the Bureau of Indian Affairs police building in Pine Ridge. There parts of the contents were taken into the building and various items retained by F.B.I. Special Agent David Price. During the day of February 28, 1973, Price and another officer again searched the Travel-all and removed and retained more items from it.

■■ Price's knowledge of the background for McGee's search was limited. He knew that the Travelall had been stopped at a roadblock and had been searched for weapons, that a quantity of weapons and ammunition had been taken from it, and that some occupants of it had been arrested. This limited knowledge was not sufficient probable cause to permit him further to search the ve-

hicle, unless the collective and uncommunicated knowledge of McGee or others may be used as a basis of Price's search or seizures. Because it is the collective knowledge, rather than the officer's individual knowledge, that governs, the searches and seizures by Price were valid. Turk v. United States, 429 F.2d 1327, n. 2, p. 1331 (C.A. 8th Cir. 1970); United States v. Stratton, 453 F.2d 36 (C.A. 8th Cir. 1972); White v. United States, 448 F.2d 250 (C.A. 8th Cir. 1971); Wood v. Crouse, 436 F.2d 1077 (C.A. 10th Cir. 1971).

Probable cause continued despite the movement of the vehicle to a location different from the roadblock. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

## ADMINISTRATIVE SEARCH

■ Counsel for the defense construct an argument that Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), governs. Perhaps it would, if searches here had been administrative searches.

It is true that a plan for control of disorders on the Pine Ridge Reservation had been prepared by Homer I. Price, a special officer with the criminal investigation unit of the Bureau of Indian Affairs at Pine Ridge, and had been discussed with some of the supervisory police personnel. But the evidence is altogether lacking that that plan or any other plan was put into effect. Efforts by the defense to show that an administrative search procedure was instituted have been fruitless, and I find as a fact that the searches involved in this case were not administrative searches or a part of any plan for administrative searches. Accordingly, the restrictions on such searches by *Almeida-Sanchez* are inapposite. Furthermore, in *Almeida-Sanchez* the government made no claim that there was probable cause; here, I have concluded that there was probable cause maturing from the investigative stop.

In view of all the foregoing, the motions to suppress evidence must be denied.

## ON MOTION FOR JUDGMENT OF ACQUITTAL FOR LACK OF JURISDICTION

The defendants were indicted on three counts under 18 U.S.C. § 1153, the so-called Major Crimes Act. The third count, that of conspiracy, has been dismissed. Count I charges an unlawful breaking and entering into the Wounded Knee Trading Post, a building where property was kept, with intent to do larceny, in violation of 18 U.S.C. § 1153 and S.D.C.L. § 22-32-9. Count II alleges that the defendants unlawfully took and carried away, with intent to steal and purloin, certain property, the personal property of another, of a value of more than $100.00, in violation of 18 U.S.C. § 1153 and § 661.

At the close of the government's case the defendants have moved for a judgment of acquittal for lack of jurisdiction. For the reasons hereinafter stated, the motion will be denied.

The pertinent provisions of 18 U.S.C. § 1153 are:

"Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, . . . burglary, . . . and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

\* \* \* \* \* \*

"As used in this section, the offense . . . of burglary . . . shall be defined and punished in accordance with the laws of the State in which such offense was committed."

The jurisdictional counterpart of this statute is 18 U.S.C. § 3242:

"All Indians committing any of the following offenses; namely, . . . burglary, . . . and larceny on and within the Indian country shall be tried in the same courts, and in the same manner, as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States."

Count I of the indictment asserts a state statute, S.D.C.L. § 22-32-9, to be the state law which serves to define "burglary." That state statute provides:

"A person breaking or entering at any time any building . . . in which any property is kept, with intent to commit larceny . . ., is guilty of burglary in the third degree."

Section 22-32-10 of the state statutes sets the maximum punishment for burglary in the third degree at 15 years.

Count II of the indictment sets 18 U.S.C. § 661 as the statute which defines and punishes the offense recited in that count. That section provides:

"Whoever, within the special maritime and territorial jurisdiction of the United States, takes and carries away, with intent to steal or purloin, any personal property of another shall be punished as follows:

"If the property taken is of a value exceeding $100, . . . by a fine of not more than $5,000, or imprisonment not more than five years, or both; in all other cases, by a fine of not more than $1,000 or by imprisonment not more than one year, or both."

Basically, the defendants argue that the offenses specifically named in 18 U.S.C. §§ 1153 and 3242 must be limited to their common law definitions and that, because neither the state statutory definition of burglary nor the federal statutory definition of larceny is identical with the common law definitions, the court has no jurisdiction.

It is true that the United States Supreme Court in United States v. Turley, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957), has declared that:

". . . [W]here a federal criminal statute uses a common-law term of es-

tablished meaning without otherwise defining it, the general practice is to give that term its common-law meaning."

See, also, Levinson v. United States, 47 F.2d 470 (C.A. 6th Cir. 1931); Oliver v. United States, 230 F. 971 (C.A. 9th Cir. 1916); United States v. Brandenburg, 144 F.2d 656 (C.A. 3rd Cir. 1944).

It is also true that the court in United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886), in the process of dealing only with the issue of whether the forerunner of the present 18 U.S.C. § 1153 was constitutional, referred to the offenses named in the statute as common law crimes. Nevertheless, the court in *Turley* recognized that, although criminal statutes are to be construed strictly, "This does not mean that every criminal statute must be given the narrowest possible meaning in complete disregard of the purpose of the legislature." Furthermore, the present §§ 1153 and 3242 do not suffer from the disability of using a common law term without otherwise defining it.

Section 1153 says that any Indian shall be subject "to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." Exactly the same language with respect to the identity of the court and the manner of trial is used in § 3242. In Gon-shay-ee, 130 U.S. 343, 9 S.Ct. 542, 32 L.Ed. 973 (1889), interpreting the 1885 Major Crimes Act, the court said:

"This phrase, 'within the exclusive jurisdiction of the United States,' is well understood as applying to the crimes which are committed within

the premises, grounds, forts, arsenals, navy-yards, and other places within the boundaries of a State, or even within a Territory, over which the Federal government has by cession, by agreement, or by reservation exclusive jurisdiction."

Today 18 U.S.C. § 7 describes those same places more expansively and affixes to them the definition of "special maritime and territorial jurisdiction of the United States." Among the specific statutes which define crimes within the special maritime and territorial jurisdiction of the United States is 18 U.S.C. § 661:

"Whoever, within the special maritime and territorial jurisdiction of the United States, takes and carries away, with intent to steal or purloin, any personal property of another shall be punished . . ."

As recognized in Acunia v. United States, 404 F.2d 140 (C.A. 9th Cir. 1968), with reference to the Major Crimes Act:

"Definitions and penalties for seven of the specified crimes, murder, manslaughter, assault with intent to kill, assault with a dangerous weapon, arson, robbery, and larceny, are found in various sections of Title 18. See 18 U.S.C. §§ 81, 113, 661, 1111, 1112, 1153, and 2111."

See also, Gourneau v. United States, 390 F.2d 320 (C.A. 8th Cir. 1968).[1]

Title 18, U.S.C. § 661 specifically defines the federal version of larceny, and there is no reason to substitute a common law definition, even assuming that the common law definition may be slightly different.[2]

1. The court disagreed with the Ninth Circuit's *Acunia* decision as to whether incest, through the Assimilative Crimes Act, 18 U.S.C. § 13, is included within § 1153 prior to an amendment to § 1153, which amendment specifically included incest. Both decisions, however, are bottomed upon the proposition that special maritime and territorial jurisdiction of the United States is incorporated into § 1153. Federal enclave law is brought within the present 18 U.S.C. § 1152, which uses the phrase "within the sole and exclusive jurisdiction of the United States." See Donnelly v. United States, 228 U.S. 243 (1913).

2. Whether there is any difference, I need not now decide. If there is a difference it is not a radical one. See United States v. Henry, 447 F.2d 283 (C.A. 3rd Cir. 1971).

To the extent that United States v. Cardish, 143 F. 640 (U.S.D.C.Wis.1906), states that Congress "intended that we should look to the common law for the definition, and should look to the federal statutes theretofore enacted for the penalty," I simply disagree. To go to the federal enclave statutes (those setting out crimes within the special maritime and territorial jurisdiction of the United States) for punishment purposes and not for definition purposes suggests a mental gyration not to be attributed to Congress lightly. It would lead to the anomaly of applying to a crime defined one way a punishment for a crime defined another way. Consistency asks for a looking to the federal enclave law for definition and punishment purposes.

With respect to Count II, § 1153 specifically declares that "burglary . . . shall be defined and punished in accordance with the laws of the State in which such offense was committed." S.D.C.L. § 22–32–9 defines burglary, although in a manner different from that of the common law. The issue is whether the state definition and punishment provisions may be used.

Several states have held that the Major Crimes Act does not include the offense of carnal knowledge or statutory rape, although the Act includes rape and declares that state law shall define rape and the state law defines rape to include carnal knowledge.[3] The bases for disregarding the state law were (1) legislative history of the Major Crimes Act indicates that a proposed amendment in 1932 intentionally named carnal knowledge as an offense but was passed after specific deletion of carnal knowledge as an offense, thus evidencing an intent that carnal knowledge not be covered, and (2) existence of a definition in the federal enclave laws different from the

state law definition, which difference could result, if state law were to apply to Indians under the Major Crimes Act and not to non-Indians under 18 U.S.C. § 1152, in conviction of an Indian for rape on a lesser showing than the showing required for conviction of a non-Indian of rape. One court has held that a similar disparity between conviction of a non-Indian under § 1152 and an Indian under the Major Crimes Act, which employs a state law definition for assault with a dangerous weapon, renders the Major Crimes Act to that extent unconstitutional.[4]

Neither of the decisive considerations in those rape and assault cases is present here. There is no legislative history suggesting an intent not to include the version of burglary in the third degree now incorporated in South Dakota law; there is no federal enclave statute on burglary, so there is no conflict with the state law.

It is, of course, possible that a state may sometime define as "burglary" some act so devoid of traditional concepts of burglary that a court cannot permit state law to apply. The present state statute does not suffer from that deficiency.[5]

 The defendants have also raised the question of this court's jurisdiction over a larceny of goods of a value of $100.00 or less in the event this court should find that the allegedly stolen goods are of $100.00 or less in value. In view of my having decided that larceny within the meaning of § 1153 is to be defined by § 661, it seems apparent that a larceny of goods whose value is $100.00 or less is punishable under § 1153, since § 661 provides for the punishment of such an offense. The defendants, however, argue that each of the twelve

---

3. United States v. Rider, 282 F.2d 476 (C.A. 9th Cir. 1960) ; United States v. Jacobs, 113 F.Supp. 203 (U.S.D.C.Wis.1953) ; United States v. Red Wolf, 172 F.Supp. 168 (U.S. D.C.Mont.1959) ; Petition of McCord, 151 F. Supp. 132 (U.S.D.C.Alaska 1957). United States v. Red Bear, 250 F.Supp. 633 (U.S. D.C.S.D.1966), is in opposition to these cas-

es and holds that the definition of rape must be under state law.

4. United States v. Boone, 347 F.Supp. 1031 (U.S.D.C.N.Mex.1972).

5. See Costello v. United States, 255 F.2d 389 (C.A. 8th Cir. 1958).

other crimes punishable under § 1153 are clearly felonies, and that the legislative history of this section demonstrates that Congress intended that the criminal jurisdiction of the federal courts over Indian behavior under this section be limited to felonies only.

After a careful reading of the legislative history of Title 18 U.S.C. § 1153, I am convinced that Congress intended the federal district courts to have jurisdiction over the offense of larceny by an Indian within the Indian country of goods, whatever their value. This section was originally enacted as the Act of March 3, 1885, c. 341, Sec. 9, 23 Stat. 385, by the 48th Congress in its second session. The original section was offered as an amendment to the Indian Appropriations Act of 1885 from the floor of the House by Congressman Cutcheon of Michigan. 16 Cong.Rec. 934. In the course of debate on the amendment Congressman Budd of California explained that in the previous year he had introduced an amendment to the Indian Appropriations Act of 1884 "which allowed an Indian who committed any crime to be punished in the courts of the State or Territory in which the crime was committed." 16 Cong.Rec. 935. This amendment was approved in 1884 by the House, 15 Cong. Rec. 2577, but was stricken by the Senate without discussion. 15 Cong.Rec. 4112. The House-Senate Conference Committee agreed to the action taken by the Senate. Congressman Budd in 1885 explained the action taken a year earlier:

"It then went to the committee of conference and there was an understanding, as was stated on the floor of the House by the gentleman from Louisiana, now in charge of this bill, that at this session of Congress a bill or section of this character, should, by the agreement of the conference committee, be enacted or incorporated into the appropriation bill providing that it punish felonies only.

\* \* \* \* \* \*

"The objection by the Senate committee to my amendment was that it punished misdemeanors as well. It will be found in the Record of the last session . . . that the gentleman from Louisiana . . . stated that they believed the amendment was a proper one, that it was in the right direction, but that it punished misdemeanors and offenses by one Indian upon another of a minor character that ought not to be so punished, and that it was understood if the same amendment was offered at this session of Congress so as only to punish felonies it would be acceptable to the committee and be adopted." 16 Cong.Rec. 935.

Following Congressman Budd's explanation, the House adopted Congressman Cutcheon's amendment by a vote of 68 to 2. 16 Cong.Rec. 936.

The Senate, however, did not readily acquiesce and struck this whole section from the House bill (H.R. 7970) without discussion. 16 Cong.Rec. 1748. Later debate on what should be done about this disagreement between the two houses of Congress indicates that the Senate had several concerns about this legislation. The foremost concern seems to have been that this type of legislation should not be attached to an appropriations bill. See 16 Cong.Rec. 2385ff. The Senate was also concerned that this section was taking criminal jurisdiction away from the state courts if the offender was an Indian and that the section violated treaties with the Indians and the Constitution. Finally, the Senate was apparently concerned that this whole subject had not received careful discussion in the appropriate committees. Throughout this entire discussion there was no mention of the fact that the legislation was meant to punish felonies only. Ultimately, the Senate drafted a version of the House bill that was acceptable, and the section was approved without comment. 16 Cong.Rec. 2466.

The Senate action, in light of the comments by Congressman Budd, could be taken as consistent with an intent to punish felonies only, were it not for two critical facts. First, there is no legislative history from the debate on the Indian Appropriations Act of 1884 that indicates that the Senate was concerned with not punishing misdemeanors. Congressman Budd's amendment was, as noted above, stricken by the Senate without discussion. 15 Cong.Rec. 4112. Moreover, Congressman Ellis, the gentleman from Louisiana referred to by Congressman Budd in his above-quoted remarks, in explaining the action taken by the House conferees in agreeing to the Senate deletion of Congressman Budd's amendment, did not draw the distinction between felonies and misdemeanors. He expressed the concern of the conference committee in 1884 as follows:

> "The Indian is not up to the standard of Anglo-American civilization. There are many little offenses which in civilization amount to crimes that are committed by Indians by long habit and by toleration among themselves. It was deemed that if this provision should pass as it is the Indian would very often be arrested for petty offenses, taken very far away from his reservation and subjected to great hardships; and it would be seized upon by unscrupulous officers as a means of accumulating fees against the Government. It was agreed when the next bill shall be reported some effort shall be made in the direction of the amendment of the gentleman from California." 15 Cong.Rec. 5802.

The interest there expressed seems to be that a list of selected crimes, rather than a list of all crimes, be made applicable to Indians.

The second critical factor is that at the time the predecessor of Title 18 U.S.C. § 1153 was first enacted, larceny under federal enclave law made no distinction based on the value of the goods stolen. Rather, it punished any taking with intent to steal or purloin any personal property of another. The penalty for such taking was a fine of up to $1,000.00 or up to one year's imprisonment or both such fine and imprisonment. Revised Statutes of 1878 § 5356. Under another federal statute, federal crimes punishable by more than one year in prison or by imprisonment at hard labor were the only federal crimes that could be punished by incarceration in a state penitentiary. Revised Statutes of 1878, §§ 5541–42. Under the common understanding of the time only crimes punishable by imprisonment in the state penitentiary were considered felonies. Mackin v. United States, 117 U.S. 348, 353, 6 S.Ct. 777, 29 L.Ed. 909 (1886). Since larceny in a federal enclave was not punishable by imprisonment in the state penitentiary, it would not be a felony under the common meaning of the term at the time the predecessor of Title 18 U.S.C. § 1153 was enacted. Thus, since larceny was one of the crimes included in this section, even though at the time it would have been considered a misdemeanor, this court is persuaded that Congress intended to take jurisdiction under Title 18 U.S.C. § 1153 over larceny of whatever grade, when engaged in by an Indian on an Indian reservation. Therefore, I am convinced that, if the facts show that there was a larceny of goods of value of $100.-00 or less, this court would have jurisdiction over this crime under Title 18 U.S.C. § 1153.

██ The only other jurisdictional difficulty presented by a determination that the goods stolen were of $100.00 or less in value is whether there is a fatal variance between the proof and the indictment, since the indictment charges a larceny of goods of the value of more than $100.00. The proper answer is found in United States v. Thweatt, 140 U.S.App.D.C. 120, 433 F.2d 1226, 1234 (1970), and Robinson v. United States, 333 F.2d 323 (C.A. 8th Cir. 1964). Both cases stand for the proposition that a variance in the value of this sort requires that the defendant be punished only for the misdemeanor larceny, but does not require an acquittal.

The prosecution, in oral argument before this court, took the position that Felicia v. United States, 495 F.2d 353 (C.A. 8th Cir. 1974), is dispositive of the issues before this court. *Felicia* held that federal courts have jurisdiction over lesser included offenses under Title 18 U.S.C. § 1153. This holding, however, was made in circumstances different from those before this court. In *Felicia* an Indian was indicted for assault with intent to inflict great bodily injury upon another Indian on an Indian reservation. The defendant requested an instruction on the lesser included offenses of assault or assault and battery pursuant to Keeble v. United States, 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973). The instruction was given and the defendant was found guilty of simple assault or assault and battery. On appeal to the Eighth Circuit, the defendant claimed that although the district court was obliged to give the lesser included offense instruction, the federal courts have no jurisdiction over the offense of simple assault or assault and battery and that therefore the court could not lawfully sentence Felicia for that offense.

The first critical distinction between this case and *Felicia* is that, as determined above, federal courts have jurisdiction over misdemeanor larceny quite independently of any analysis resting on *Keeble*. Second, there has been no request by the defendants in this case for a lesser included offense instruction and hence no anomaly of receiving the benefit of an instruction and yet refusing to accept its logical consequence.

Nevertheless, it is true that the language of *Felicia* is broad enough to reach the case before us. But *Felicia's* language is broader than was necessary to reach the result that court did. Moreover, its analysis makes no reference to the legislative history of this section. Whatever the applicability of *Felicia's* reasoning to other lesser included offenses, it is apparent that it is inconsistent with Congressional intent at least so far as assault and battery are concerned. The 1885 bill as originally introduced by Congressman Cutcheon listed the crime of aggravated assault and battery. Congressman Ellis urged that this be struck from the bill. Congressman Cutcheon readily agreed:

> "We already have among the Indians the court of Indian offenses for the punishment of trivial violations of the law. That court can take care of cases of assault and battery." 16 Cong. Rec. 934.

Given this inconsistency with the clear legislative history, the general thrust of the legislative history that only the crimes specified in the section were to be punished under it, and the independent justification for jurisdiction over misdemeanor larceny, this court finds it unnecessary to rest its decision on *Felicia*.

Therefore, it hereby is ordered that the motion for judgment of acquittal, insofar as it is based upon lack of jurisdiction, is denied.