**UNITED STATES of America,
Plaintiff,**

v.

**Frank IMBRUGLIA et al.,
Defendants.**

**Crim. A. No. 73–233–J.**

United States District Court,
D. Massachusetts.

July 30, 1975.

Jeremiah O'Sullivan, Boston, Mass., for the U. S.

Harvey Brower, Boston, Mass., for defendant Frank Imbruglia.

Daniel F. Featherston, Jr., Boston, Mass., for defendant Schocker.

Jack I. Zalkind, Boston, Mass. for defendant Schreter.

Paul F. Markham, Boston, Mass., for defendant Gerardi.

## MEMORANDUM OF DECISION ON MOTION TO SUPPRESS

JULIAN, Senior District Judge.

This case is before the Court on the motion of the defendants Gerald Gerardi and Marshall Schreter to suppress items seized in searches of a Lincoln automobile. An evidentiary hearing was held on the motion.

At the end of August, 1973, Secret Service Agent Francis Searle acting in an undercover capacity, met at the Sonesta Hotel in Cambridge with the defendant Frank Imbruglia. At this meeting Imbruglia sold Searle a "package" of United States Savings Bonds which had been previously stolen in New York. Imbruglia and Robert Donati sold additional stolen savings bonds to Searle at various times during September and October of 1973. At least some of the bonds had been stolen in New York. Donati also delivered samples of counterfeit money to Agent Searle during this same period. During Searle's first meeting with Donati, Donati told Searle, in the presence of Imbruglia, that they could sell him $500,000–$600,000 in stolen securities.

On October 15, 1973, Searle had a telephone conversation with Donati. In this conversation, Donati told Searle that he and Imbruglia were negotiating to obtain securities from some people from Ohio, but that these people had backed out of the deal because they were afraid Donati and Imbruglia were going to kill them. Prior to this conversation, Searle had a telephone conversation with Donati on October 12, 1973. In this conversation, Donati told Searle that if everything did not go according to plan with the deal they were setting up with a corrupt banker (who was actually an undercover agent) that someone would be murdered.

On the evening of October 16, 1973, Searle and the undercover agent who was acting as the corrupt banker met with Imbruglia and the defendant Richard Schocker in the cocktail lounge of

the Sonesta Hotel in Cambridge. Imbruglia introduced Schocker as his partner. Schocker told the agents at this time that he was acting as a middle man for some important people who were "fronting" the "package" of stolen securities. Prior to this meeting, Searle had had several conversations with Donati and Imbruglia concerning whether Searle could sell stolen Treasury Notes and Bills. At this meeting, Imbruglia and Schocker delivered a bag containing approximately $35,000 in stolen savings bonds to Searle and showed him a $15,000 Treasury Bill and $100,000 Treasury Note which were to be part of a larger package of stolen securities that was to be given to him the next day so that the corrupt banker could negotiate them at his bank. Schocker told Searle at this meeting that the Treasury Note had been stolen in New York.

Secret Service Agents Donald Gautreau and Gerald Belliveau were in the Sonesta cocktail lounge on the evening of October 16, 1973, and observed Schocker arrive with a bag. While in the Sonesta lounge, Gautreau and Belliveau had a conversation with Donati, who told them that he had a .45 caliber pistol which he had used to shoot a moose in Maine. The agents also observed Paul Johnson present in the Sonesta cocktail lounge at this time.

On October 17, 1973, at approximately 8:00 A.M., Searle met with Schocker and Schreter in the coffee shop of the Sheraton-Boston Hotel in the Prudential Center. At this meeting Schocker introduced Schreter, who asked Searle questions about how the corrupt banker was going to turn the stolen securities into cash at his bank. Schreter told Searle that he and another individual had driven by automobile from New York with the stolen Treasury Bills and Notes which are the subject of the present indictment. Schreter warned Searle that the stolen securities had been sent by some "heavy" people from New York and that he and his companion were there to guard the securities. Schreter

also told Searle that he would be in "serious trouble" if anything went awry. At this meeting Searle told Schreter that the stolen securities would be used as part of a phony loan at the bank and that they would get cash and cashier's checks from the bank in return for the stolen securities.

After this 8:00 A.M. meeting at the Sheraton-Boston coffee shop, Schreter left the hotel and entered a silver Lincoln automobile, Connecticut Registration MM8869, which was parked across the street from the hotel. He sat there from 9:00 A.M. until approximately 11:00 A.M. Gerardi sat with Schreter in the automobile during all of this period. Secret Service Agent Leo Sullivan had Gerardi and Schreter under constant observation as they sat in the Lincoln, except for a few minutes when Sullivan left his point of observation in a building in order to get into his own automobile. Sullivan reported his observations concerning Schreter and Gerardi to the other agents by radio transmission.

After the 8:00 A.M. meeting in the Sheraton coffee shop, Searle returned to the Secret Service office where he briefed Agents Monihan, Gautreau and other agents working the case on his conversation with Schocker and Schreter in the coffee shop.

At approximately 11:00 A.M., Searle met with Donati, Imbruglia and Schreter at the Sheraton-Boston Hotel. Searle had a conversation at this time with Imbruglia and Donati out of the presence of Schreter. Searle expressed concern that Schreter and his companion probably had guns. Donati stated that of course they had guns, but that he and Imbruglia had guns too and that he had a rifle in the trunk of his car. Searle then telephoned Agent Monihan and told him that he had been told by Imbruglia and Donati that everyone had guns. Monihan made a radio transmission to inform the other agents of that which Searle had told him regarding the guns and to warn them to be very cautious when they arrested the defendants.

Gautreau was one of the agents who received this radio transmission from Monihan.

After making the telephone call to Monihan, Searle rejoined Imbruglia, Donati and Schreter, at which time Shreter gave him an envelope containing the Treasury Bills and Notes which are the subject of the present indictment. They all then exited the Sheraton-Boston onto the sidewalk outside. Searle asked Donati, Imbruglia and Schreter if they wanted to ride in his automobile to the bank. They declined and said they would take their own cars. Schreter then walked across the street towards the Lincoln in which he and Gerardi had sat for two hours that morning. About halfway across the street, Schreter discovered, after patting his pockets, that he did not have the keys to the Lincoln and signaled to the defendant Gerardi who was standing nearby. Gerardi ran over to Schreter and handed him keys, they entered the Lincoln, drove it behind Searle's automobile, and Schreter told Searle they were ready. Donati and Imbruglia got into another automobile and also pulled into line. The three automobiles left the Sheraton-Boston, with Agent Searle's car in the lead. All of the automobiles proceeded to the area of the First National Bank at Franklin and Congress Streets in Boston.

After the three vehicles arrived at the First National Bank, Searle got out of his vehicle and entered the bank, purportedly to give the stolen securities to the corrupt banker. He told another agent the transaction was complete, and the signal was given to arrest the defendants.

At this time Agent Donald Gautreau was stationed in an outside alcove of the New England Telephone Company Building directly across the street from the First National Bank. The silver Lincoln in which Gerardi and Schreter had arrived was parked at the curb in close proximity to Gautreau. Gerardi was standing in a telephone booth about 10–15 feet from the Lincoln; Schreter had disappeared from Gautreau's view. Upon receiving the radio transmission from Agent Monihan stating that the stolen Treasury Notes and Bills had been delivered and to effect the arrests, Gautreau placed the defendant Gerardi under arrest and Gerardi was handcuffed.

Prior to effecting the arrest of Gerardi, Gautreau knew that the defendant Schreter had met earlier in the morning with Searle at the Sheraton coffee shop to discuss the delivery of stolen Treasury Bills and Notes to Searle. He knew that Schreter was accompanied in the Lincoln by Gerardi. He also had been informed by Agent Monihan that the defendants had guns and that Donati had a rifle in the trunk of his car. Further, he knew that Schreter and Gerardi had been under surveillance by Agent Sullivan at the Sheraton Hotel and while they were in the Lincoln. He also knew that Sullivan had followed them to the area of the First National Bank.

After arresting Gerardi, Gautreau made a cursory search of the Lincoln for weapons after taking the keys to the automobile from Gerardi. Gerardi did not consent to the search. While making a cursory search of the trunk of the Lincoln, Gautreau saw the barrel of a gun protruding from a hole in a woolen ski mask. He found a loaded .38 caliber pistol and a loaded silver automatic .25 caliber handgun wrapped in ski masks.

The factors that caused Gautreau to search the trunk of the Lincoln include: threats had been made to Searle by some of the suspects that someone would be hurt or murdered if the deal did not go as planned; Donati had told Gautreau that he owned a .45 caliber pistol and Searle had been told that all participants had guns; Gautreau did not know where the other suspects, who might have access to guns secreted in the trunk, were at the time he arrested Gerardi; his experience in other cases led him to realize that one of the participants in the sale of the securities could have been secret-

ed in the trunk of the Lincoln and thus posed a threat to the agents; there were a large number of persons present in the area where the arrest took place.

At about the same time as Gautreau's arrest of Gerardi, or a short time thereafter, other agents arrested Schreter, Imbruglia and Donati. After the arrests of Gerardi, Schreter, Imbruglia and Donati, a search was made of the area around the First National Bank in an effort to locate and arrest Johnson and Schocker.

After the arrests of Gerardi and Schreter, Special Agent Hewitt, as a result of instructions he received from his superior, Gautreau, drove the Lincoln back to the Secret Service office. At the time Hewitt got into the automobile it was parked in a restricted parking area on Congress Street. Gautreau and Hewitt believed the automobile had been used in the commission of a crime. Hewitt parked the automobile in an outside parking lot at the Secret Service office in Cambridge. Hewitt inventoried the contents of the automobile pursuant to the seizure of the automobile for forfeiture and to protect the contents of the automobile from theft, since the Secret Service had experienced problems with vandalism and theft in the parking lot. In the trunk of the car he found two suitcases, a vinyl clothing bag, some pairs of shoes, a booklet of traveler's checks, stolen credit cards and a stolen driver's license. Hewitt made a list of the car's contents and removed the con-

tents and placed them in a vault in the Secret Service office. The Lincoln and much of its contents were later returned by Secret Service and the inventory list was destroyed by Secret Service.

The arrests of Gerardi, Schreter, Imbruglia and Donati were made without warrants. The agents had probable cause to arrest these men and to search the Lincoln. No search warrant was obtained prior to either of the two searches of the Lincoln.

*Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), presented a situation similar to that in the present case.

In *Chambers,* the petitioner was riding in an automobile at the time of his arrest for robbery. The arresting officers had probable cause to make the arrest. There was also probable cause to search the car for guns and stolen money. The automobile was taken to a police station and was there thoroughly searched without a warrant. The petitioner argued the evidence obtained in the search was inadmissible.

In *Chambers,* there was "no claim . . . made that state law authorized that the station wagon be held as evidence or as an instrumentality of the crime; nor was the station wagon an abandoned or stolen vehicle." *Id.* at 49–50 n. 7, 90 S.Ct. at 1980.[1] The Court ruled, nevertheless, that:

> "It was not unreasonable . . . to take the car to the station house. All

---

1. In the present case, the government initially asserted that the searches were valid since the automobile was used to transport stolen United States securities and was, therefore, subject to forfeiture under 49 U. S.C. § 781 et seq. The government now concedes that 49 U.S.C. § 781 et seq. does not apply to vehicles which transport *stolen* (as opposed to falsely made, forged, altered or counterfeit) securities. The government, however, now attempts to justify the second search of the Lincoln by the argument that the two handguns were transported in interstate commerce in violation of § 1202(a)(1) of Title 18, Appendix, United States Code, and thus constituted "contraband articles" under 49 U.S.C. § 781(b)(2). If this argu-

ment is correct, the Lincoln was subject to forfeiture pursuant to 49 U.S.C. § 781 et seq.

Section 1202(a)(1) of Title 18, Appendix, United States Code, makes it a criminal offense for any person who has been convicted of a felony to transport any firearm in commerce. No evidence was introduced at the hearing on the motion to suppress that Gerardi, Schreter or any defendant had ever been convicted of a felony prior to the time of the arrests in this case. There is, therefore, insufficient evidence to establish that the interstate transportation of the two handguns was in violation of § 1202(a)(1) and the government's argument is inapplicable.

occupants in the car were arrested in a dark parking lot in the middle of the night. A careful search at that point was impractical and perhaps not safe for the officers, and it would serve the owner's convenience and the safety of his car to have the vehicle and the keys together at the station house."

*Id.* at 52, n. 10, 90 S.Ct. at 1981. The Supreme Court ruled that the car could have been searched without a warrant[2] on the spot where it was stopped since there was probable cause to search it and it was a fleeting target for a search. *Id.* at 52, 90 S.Ct. 1981. Since the "probable-cause factor still obtained at the station house and so did the mobility of the car," the Court dismissed the argument that the search was invalid because it did not occur on the spot where the car was stopped but at the police station. *Id.*

■ The initial warrantless search of the Lincoln, during which two handguns and two masks were seized, was permissible under *Chambers*. Secret Service Agent Gautreau had probable cause to believe the defendants were armed and had transported weapons in their cars. The guns are evidence that corroborate the agents' belief that Gerardi and Schreter were present to guard the stolen securities. The guns are physical evidence which tend to demonstrate Gerardi and Schreter's participation in the crime which is alleged. Furthermore, since Gautreau did not know whether the other defendants had been apprehended, he did not know whether they would attempt to gain access to the automobile and any weapons which may have been in the car. It was thus necessary for Gautreau to search the Lincoln for weapons to ensure the safety of the agents and of the general public and to prevent destruction of evidence. Gau-

treau, therefore, had probable cause to search the automobile for weapons and it was not necessary that he obtain a search warrant prior to conducting the search. *Chambers v. Maroney*, 399 U.S. 42, 46–52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (probable cause to search a car for guns and stolen money); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); see *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (search justified by concern for general public who might be endangered if intruder removed a revolver from trunk of a vehicle); *Cooper v. California*, 386 U.S. 58, 61–62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967) (search motivated by desire to guarantee the safety of the car's custodians was reasonable); see also *United States v. Sharpe*, 452 F.2d 1117 (1 Cir. 1971); *United States v. Castaldi*, 453 F.2d 506 (7 Cir. 1971), *cert. denied*, 405 U.S. 992, 92 S.Ct. 1263, 31 L.Ed.2d 460 (1972); *cf. Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L. Ed.2d 564 (1971).

■ The initial search of the Lincoln's trunk was cursory. It occurred at midday while the automobile was parked in a restricted area on a busy street in the congested financial district of Boston. It would have been impractical to make a "careful," *Chambers v. Maroney,* 399 U.S. at 52 n. 10, 90 S.Ct. 1975, "thorough," *id.* at 43, 90 S.Ct. 1975, or "effective," *id.* at 51, 90 S.Ct. 1975, search at that time and place. Furthermore, the agent who conducted the cursory search did not know whether all the suspects were yet in custody, and, in fact, the defendant Schocker and another suspect, Johnson, were not apprehended at the time of the arrests of Donati, Gerardi, Imbruglia and Schreter. These unapprehended men may have been in the area. They thus would pose a threat

---

**2.** "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate

search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." 399 U.S. at 52, 90 S.Ct. at 1981.

to the safety of any agent who made a careful search. Under these circumstances, it was not unreasonable to take the Lincoln to the Secret Service parking lot. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

■ When the Lincoln arrived at the Secret Service parking lot, there may have been additional weapons in the automobile. Since the probable cause [3] to search the car for weapons still existed, and since the car retained its mobility, *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the second more thorough search of the Lincoln in the parking lot was permissible under the Fourth Amendment. *United States v. Sherman,* 430 F.2d 1402 (9 Cir. 1970), *cert. denied,* 401 U.S. 908, 91 S. Ct. 865, 27 L.Ed.2d 805 (1971); *Smith v. United States,* 431 F.2d 1 (8 Cir. 1970), *cert. denied,* 402 U.S. 915, 91 S. Ct. 1396, 28 L.Ed.2d 658 (1971); *Kirby v. Cox,* 435 F.2d 684 (4 Cir. 1970), *cert. denied,* 404 U.S. 834, 92 S.Ct. 118, 30 L. Ed.2d 64 (1971); *United States v. Chalk,* 441 F.2d 1277 (4 Cir.), *cert. denied,* 404 U.S. 943, 92 S.Ct. 294, 30 L. Ed.2d 258 (1971); *United States v. D'Avanzo,* 443 F.2d 1224 (2 Cir.), *cert. denied,* 404 U.S. 850, 92 S.Ct. 86, 30 L. Ed.2d 89 (1971); *United States v. Edge,* 444 F.2d 1372, 1375 (7 Cir.), *cert. denied,* 404 U.S. 855, 92 S.Ct. 101, 30 L. Ed.2d 97 (1971); *United States v. Ellis,* 461 F.2d 962 (2 Cir.), *cert. denied,* 409 U.S. 866, 93 S.Ct. 162, 34 L.Ed.2d 115 (1972); *United States v. Gulledge,* 469 F.2d 713 (5 Cir. 1972); *United States v. Ortega,* 471 F.2d 1350 (2 Cir. 1972), *cert. denied,* 411 U.S. 948, 93 S.Ct. 1324,

36 L.Ed.2d 409 (1973); *Dykes v. Camp,* 333 F.Supp. 923 (E.D.Mo.1971); *United States v. Gilbert,* 378 F.Supp. 82 (D.S. D.1974).

■■ The fact that the agent who conducted the second search was not searching for additional weapons does not render the search invalid. He testified that the purpose of his search was to make an inventory pursuant to the seizure of the automobile for forfeiture and to protect the contents of the automobile from theft. The automobile, however, was not subject to forfeiture, see fn. 1, *supra.* The test of probable cause is not the articulation of the agent's subjective theory for the search, but an objective view of the facts. *White v. United States,* 448 F.2d 250, 254 (8 Cir. 1971), *cert. denied,* 405 U.S. 926, 92 S.Ct. 974, 30 L.Ed.2d 798 (1972) (citing cases); *Guzman v. Estelle,* 493 F.2d 532, 536 n. 13 (5 Cir. 1974) (listing cases); *United States v. Gilbert,* 378 F.Supp. 82, 87–88 (D.S.D.1974); see *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Brinegar v. United States,* 338 U.S. 160, 175–178, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). As stated by the Ninth Circuit,

"Even if officers erroneously rely upon a specific doctrine or presumption as entitling them to make a search or arrest, their action will still be sustained if it was objectively justifiable on other grounds."

*United States v. Vital-Padilla,* 500 F.2d 641, 644 (9 Cir. 1974); *cf. United States v. Darrow,* 499 F.2d 64, 69 (7 Cir. 1974); *United States v. Peltier,* —— U.S. ——, 95 S.Ct. 2313, 45 L.Ed.2d 374

---

3. Although probable cause existed for the second search of the Lincoln, the questions posed to the agent who conducted that search did not focus on whether he knew of all the factors which provided probable cause for the search. In view of all the evidence, it is highly likely that his personal knowledge was sufficient to establish probable cause. Whether probable cause for a search existed, however, is determined by evaluation of the collective information of all the agents, not by evaluation of the informa-

tion known to the one who conducted the search. *E. g., Wood v. Crouse,* 436 F.2d 1077, 1078 (10 Cir.), *cert. denied,* 402 U.S. 1010, 91 S.Ct. 2193, 29 L.Ed.2d 432 (1971); *White v. United States,* 448 F.2d 250, 254 (8 Cir. 1971), *cert. denied,* 405 U.S. 926, 92 S. Ct. 974, 30 L.Ed.2d 798 (1972); *Guzman v. Estelle,* 493 F.2d 532, 536 n. 13 (5 Cir. 1974); *United States v. Jones,* 352 F.Supp. 369 (S.D.Ga.1972), *aff'd,* 481 F.2d 1402 (5 Cir. 1973); *United States v. Gilbert,* 378 F. Supp. 82, 88 (D.S.D.1974).

(1975). The second search of the Lincoln was objectively justifiable as a search for weapons.

The seizure of the items during the searches of the Lincoln was lawful, but the issue of whether any item is inadmissible for any reason other than illegal search and seizure will be decided if and when it is offered in evidence at trial.

The motion to suppress is denied.