UNITED STATES of America, Appellee,

v.

**Reginald Karl DODGE, Jr., Appellant.**

UNITED STATES of America, Appellee,

v.

**Bernard Bravo ESCAMILLA, Appellant.**

UNITED STATES of America, Appellee,

v.

**Manuel ALVARADO and Terry Gene Williams, Appellants.**

UNITED STATES of America, Appellee,

v.

**Allen Fairfax COOPER, Appellant.**

UNITED STATES of America, Appellee,

v.

**Mark Joseph FLEURY et al., Appellants.**

Nos. 75–1173, 75–1398, 75–1483, 75–1485 and 75–1498.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 17, 1975.

Decided April 26, 1976.

Rehearing and Rehearing En Banc Denied July 15, 1976.

John E. Thorne, San Jose, Cal., and Vine Deloria, Golden, Colo., Larry Leventhal, Minneapolis, Minn., for appellants on the treaty issue.

Duane L. Nelson, Sp. Asst. U. S. Atty., Lincoln, Neb., for appellee, United States; Kenneth L. Fields, Trial Atty., U.S. Dept. of Justice, Washington, D.C., on brief.

Donald H. Berman, Boston, Mass., for appellant, Alvarado, and others; Martin C. Gideonse, Boston, Mass., Joseph Beeler, Miami Beach, Fla., on brief.

Jeremiah S. Gutman, New York City, made argument for Fleury.

Donald L. Doernberg, New York City, for Dodge, and others; Aaron J. Jaffe, New York City, on brief.

Sherman C. Magidson and Carl P. Clavelli, Chicago, Ill., on brief for Escamilla.

Joseph Beeler, Miami Beach, Fla., and Donald L. Doernberg and Jeremiah S. Gutman, New York City, on brief for Fleury, Wesaw and Johns.

Before HEANEY, BRIGHT and WEBSTER, Circuit Judges.

HEANEY, Circuit Judge.

We consolidate these appeals arising out of the "Wounded Knee" incident of 1973 for purposes of argument and opinion.

In No. 75–1485, Allen Fairfax Cooper appeals from a decision of Chief Judge Warren K. Urbom, District of Nebraska, holding that the United States had criminal jurisdiction to try Cooper on the charge of assaulting a United States Postal Inspector on the Pine Ridge Indian Reservation while the Inspector was in the performance of his official duties in violation of 18 U.S.C. §§ 111 and 1114.[1]

In No. 75–1498, Mark Joseph Fleury appeals from an unreported decision of Judge Urbom convicting him of second degree burglary in violation of 18 U.S.C. §§ 1152 and 13 and S.D.C.L. § 22–32–3.

In Nos. 75–1173 and 75–1498, Fleury, Colin Robin Wesaw, Larry A. Johns and Reginald Karl Dodge, Jr., appeal from an unreported decision of Judge Urbom convicting them of conspiracy to obstruct, impede or interfere with law enforcement officers, in violation of 18 U.S.C. §§ 231(a)(3) and 371.

In No. 75–1398, Bernard Bravo Escamilla appeals from his conviction by a jury of the lesser included offense of simple assault in violation of 18 U.S.C. §§ 2111 and 924(c)(1).

In No. 75–1483, Manuel M. Alvarado and Terry Gene Williams appeal from their conviction by a jury of burglary in the fourth degree in violation of 18 U.S.C. § 1153 and S.D.C.L. §§ 22–32–11 and 22–32–13.

We consider first the issue raised by all the appellants that the United States has no criminal jurisdiction to try any of the offenses involved in these proceedings. We then consider issues raised by all the appel-

lants except Cooper relating to alleged governmental misconduct. Finally, we turn to the issues raised by the appellants in their individual cases.

I. JURISDICTION OF THE UNITED STATES DISTRICT COURT.

Each of the appellants argues that the United States District Court lacked jurisdiction to try them on the charges for which they were convicted because jurisdiction over the offenses committed on the Pine Ridge Reservation was reserved to the Sioux Nation under the Fort Laramie Treaty with the United States dated April 29, 1868, 15 Stat. 635. The appellants reason that the 1868 Treaty reserved to the Sioux Tribes, who signed the Treaty, exclusive criminal jurisdiction for any crimes committed within their homeland. They recognize that the United States Supreme Court and this Court have decided to the contrary. The appellants contend, however, that they did so without benefit of the extensive evidence presented in this case by Indians and experts on Indian history and that the Indian Chiefs and Headmen who signed the 1868 Treaty understood it to mean that they had the exclusive right to govern themselves in their homeland, including the criminal jurisdiction for any crimes committed therein.

Judge Urbom considered these contentions in his opinion published at *United States v. Consolidated Wounded Knee Cases*, 389 F.Supp. 235 (D.Neb. & W.D.S.D. 1975). He concluded that the broad proposition advanced by the appellants could not be accepted and held that the federal court had jurisdiction over the charges pending against these appellants.[2]

In summary, Judge Urbom found that the Treaty of 1868 created criminal jurisdiction over crimes committed by non-Indians

1. Judge Urbom's opinion on the jurisdictional issue is reported at *United States v. Consolidated Wounded Knee Cases*, 389 F.Supp. 235 (D.Neb. & W.D.S.D.1975). Cooper entered a plea of nolo contendere before trial with the understanding that he could question the jurisdiction of the trial court on appeal.

2. This Court acknowledges its appreciation to Judge Urbom for undertaking the trial of these and numerous other cases arising out of the occupation of Wounded Knee.

upon Sioux Indians[3] and by Sioux Indians upon non-Indians on the Sioux reservations.[4] He found that 23 Stat. 385, now codified as 18 U.S.C. §§ 1153 and 3242 (The Major Crimes Act), created jurisdiction for certain major crimes committed by Indians against Indians on Indian reservations. *See Keeble v. United States,* 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973); *United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); *Iron Crow v. Oglala Sioux Tribe of Pine Ridge Res.,* 231 F.2d 89 (8th Cir. 1956).[5] He also found that the Indian Citizenship Act of 1924, 43 Stat. 253, 8 U.S.C. § 1401(a)(2), created federal jurisdiction to try Indians accused of violating general federal criminal laws. *See Ex Parte Green,* 123 F.2d 862, 864 (2nd Cir. 1941), *cert. denied,* 316 U.S. 668, 62 S.Ct. 1035, 86 L.Ed. 1744 (1942).

No useful purpose would be served by attempting to improve on the thoughtful opinion of Judge Urbom. We, therefore, adopt it as our own insofar as it applies to the appellants before us, with the exception of the determination of jurisdiction over Fleury for his conviction of second degree burglary. We specifically hold that:

■ (1) Jurisdiction over Cooper, an Indian, for his assault of a federal Postal Inspector in violation of 18 U.S.C. §§ 111 and 1114 is found under the general criminal laws of the United States which are applicable to Indians on Indian reservations. *Stone v. United States,* 506 F.2d 561, 563 (8th Cir. 1974); *Ex Parte Green, supra.*

■ (2) Jurisdiction over Fleury, a non-Indian, for second degree burglary of a non-Indian home on an Indian reservation in violation of 18 U.S.C. §§ 1152 and 13 and S.D.C.L. § 22–32–3 is premised on the express language of 18 U.S.C. § 1152. That premise is incorrect. The federal government has no jurisdiction under § 1152, absent a contrary treaty provision for this crime because the state in which the reservation is situated has exclusive jurisdiction over it. *New York ex rel. Ray v. Martin,* 326 U.S. 496, 66 S.Ct. 307, 90 L.Ed. 261 (1946); *United States v. Ramsey,* 271 U.S. 467, 46 S.Ct. 559, 70 L.Ed. 1039 (1926); *United States v. McBratney,* 104 U.S. 621, 26 L.Ed. 869 (1881); *United States v. Goings,* 527 F.2d 183 (8th Cir. 1975); *United States v. Cleveland,* 503 F.2d 1067 (9th Cir. 1974).

The Supreme Court in *United States v. McBratney, supra,* 104 U.S. at 624, 26 L.Ed. at 870, in discussing an indictment of a white man for murdering a white on the Ute Reservation under R.S. §§ 2144, 2145, 2146, the predecessor to 18 U.S.C. § 1152, stated:

> The State of Colorado, by its admission into the Union by Congress, upon an equal footing with the original States in all respects whatever, without any such exception as has been made in the Treaty with the Ute Indians and in the Act establishing a territorial government, has acquired criminal jurisdiction over its own citizens and other white persons throughout the whole of the territory within its limits, including the Ute Reservation, and that reservation is no longer within the sole and exclusive jurisdiction

---

**3.** Acts of Congress from as early as March 3, 1817, 3 Stat. 383, presently codified as 18 U.S.C. § 1152, created general federal criminal jurisdiction over non-Indians committing crimes against Indians on Indian land except where exclusive jurisdiction remained with the Indian tribe by treaty stipulations.

**4.** Jurisdiction over Indians committing crimes against non-Indians on Indian lands is also based upon the language of 18 U.S.C. § 1153. *Gon-shay-ee, Petitioner,* 130 U.S. 343, 9 S.Ct. 542, 32 L.Ed. 973 (1889), and *Henry v. United States,* 432 F.2d 114 (9th Cir. 1970), *cert. denied,* 400 U.S. 1011, 91 S.Ct. 576, 27 L.Ed.2d 625 (1971).

**5.** The appellants argue for the first time on appeal that even if the Seven Major Crimes Act of 1885 extended jurisdiction, that the Agreement of 1889, 25 Stat. 888, returned this jurisdiction to the Sioux. They rely on the doctrine that the latter in time treaty or Act of Congress controls. Assuming *arguendo* that the Agreement of 1889 returned jurisdiction to the Sioux, subsequent reaffirmances of the Seven Major Crimes Act with the addition of other offenses in 1909, 35 Stat. 1151 and 1932, 47 Stat. 336, 337, are clearly later in time.

of the United States. The courts of the United States have, therefore, no jurisdiction to punish crimes within that reservation, unless so far as may be necessary to carry out such provisions of the Treaty with the Ute Indians as remain in force. But that Treaty contains no stipulation for the punishment of offenses committed by white men against white men. It follows that the Circuit Court of the United States for the District of Colorado has no jurisdiction of this indictment * * *.

The Court in *New York ex rel. Ray v. Martin, supra,* 326 U.S. at 497–498, 66 S.Ct. at 308, 90 L.Ed. at 262, stated that:

> [*McBratney*] has since been followed by this Court and its holding has not been modified by any act of Congress. * * (Footnote omitted.)

We note that the language of the Treaty between the United States and the Ute Indians of March 2, 1868, 15 Stat. 619, Article VI, concerning criminal jurisdiction of the United States, is identical to the language found in the Treaty between the United States and the Sioux Indians of April 29, 1868, 15 Stat. 635, Article I, paragraphs 2 and 3. It follows that there is no exception in the Sioux Treaty granting the United States jurisdiction over this crime.

Accordingly, we reverse the conviction of Fleury for burglary against a non-Indian on the reservation for lack of jurisdiction.

■ (3) Jurisdiction over Fleury, a non-Indian, for his alleged participation in a conspiracy to commit acts to obstruct, impede and interfere with law enforcement officials at Wounded Knee in violation of 18 U.S.C. §§ 231 (a)(3) and 371 is found under the general criminal laws of the United States that apply whenever citizens are within the territorial jurisdiction of the United States, including Indian reservations. Jurisdiction over Dodge and Wesaw Indians, for the same alleged activities is found under the general criminal laws of the United States which are applicable to Indians on Indian reservations. *Stone v. United States, supra,* and cases cited therein, and *Ex Parte Green, supra.*[6]

■ (4) Jurisdiction over Escamilla, a non-Indian, for his assault against an Indian, in violation of 18 U.S.C. §§ 2111 and 924(c)(1), is found under the express language of 18 U.S.C. § 1152.

■ (5) Jurisdiction over Alvarado and Williams, Indians, for fourth degree burglary of the house of an Indian, in violation of 18 U.S.C. § 1153 and S.D.C.L. §§ 22–32–11 and 22–32–13, is found under the express language of 18 U.S.C. § 1153.

## II. INFORMANT.

Fleury, Wesaw, Johns,[7] Alvarado and Williams assert that their convictions should be overturned and their indictments dismissed because the action of FBI informants Douglas Durham and Harry and Jill Schafer violated their attorney-client privilege and their right to effective assistance of counsel.[8] Both Judge Urbom, in the cases of Dodge, Fleury, Wesaw, Johns, Alvarado and Williams,[9] and Judge Bogue, in the case of Escamilla, held evidentiary hearings and found that the appellants' attorney-client privilege and right to counsel

---

**6.** The record is unclear as to whether appellant Johns is or is not an Indian. In either event, jurisdiction over him is clear.

**7.** Appellant Dodge moved the trial court below for a judgment of acquittal on the informant issue in a joint motion with appellants Fleury, Wesaw and Johns. He did not raise the issue either in his briefs or oral argument to this Court. However, Dodge was tried with Fleury, Wesaw and Johns and the issues raised here as to the informant question are identical to those raised by all four appellants below.

**8.** Appellant Escamilla raised the informant issue at trial, and Judge Bogue ruled adversely to him. Although Escamilla has not specifically raised this issue here, we find the issues raised by the appellants here essentially the same as those raised by Escamilla below.

**9.** *United States v. Cooper,* 397 F.Supp. 277 (D.Neb.1975).

had not been prejudicially violated by the informants' actions.[10] We affirm.

Prior to the Wounded Knee incident, Douglas Durham served in undercover and informant roles for various law enforcement agencies on unrelated cases. He went to Wounded Knee for one day in March, 1973, as a photographer for a newspaper. He supplied copies of the photographs taken by him on this occasion to the FBI in Des Moines, Iowa. From April to September, 1973, he worked with the American Indian Movement (AIM) Chapter in Des Moines, Iowa. He became a regular companion of Dennis Banks in late 1973, and was in and out of AIM offices in St. Paul, Minnesota, from January through mid-September, 1974, serving first as the AIM National Security Director and later as National Administrator assigned to organize the National AIM office and other regional AIM offices. At the conclusion of the Banks and Means trial in September, 1974, Durham traveled in the United States and Canada in his capacity as National Administrator and companion of Banks until he was exposed as a FBI informant on March 7, 1975. From April, 1973 until March, 1975, he supplied information to the FBI on AIM leaders and activists and on AIM activities.

Harry Schafer was in Wounded Knee from March 23 until May 2, 1973. He served in no official capacity in AIM but helped organize attempts to secure supplies for those participating in the incident. Harry Schafer had no direct contact with AIM or any of its principals subsequent to May 10, 1973. Jill Schafer was present in South Dakota from March 31 to April 10, 1973. She served in the Wounded Knee Communications Center in Rapid City, South Dakota, as a secretary. Jill Schafer had no direct contact with AIM or any of its principals subsequent to May 10, 1973. From March 23 until May 10, 1973, the Schafers supplied the FBI information on persons and activities at Wounded Knee.

The appellants contend that the Schafers and Durham had access to the legal files of a group of attorneys and legal workers known as the Wounded Knee Legal Defense/Offense Committee (Committee) that represented in one capacity or another all of these appellants and many others charged as a result of the incident at Wounded Knee.[11] They further contend that Durham was present during conferences between attorneys and clients in St. Paul during the period of the Banks and Means trial, and that he was present during similar conferences in Lincoln, Nebraska, in January, 1975. They argue that the files and conferences concerned legal matters and defense strategy common to them and other Wounded Knee defendants. They also contend that Durham and the Schafers had the opportunity to leak defense plans to the FBI and the prosecutors in their respective cases. They argue that the activities by the FBI, Durham and the Schafers constitute gross misconduct that requires reversal of their convictions under the principles enunciated in *Hoffa v. United States,* 385 U.S. 293, 306–308, 87 S.Ct. 408, 415–416, 17 L.Ed.2d 374, 384–385 (1966), and *South Dakota v. Long,* 465 F.2d 65, 71–72 (8th Cir. 1972), *cert. denied sub nom.,* 409 U.S. 1130, 93 S.Ct. 951, 35 L.Ed.2d 263 (1973).

We have carefully reviewed the testimony and exhibits presented in the hearings on this issue before Judge Urbom, Judge Bogue and Judge McManus in *United States v. Crow Dog,* 399 F.Supp. 228 (N.D. Iowa 1975),[12] *aff'd,* 532 F.2d 1182 (8th Cir. 1976), and we have extensively examined the FBI informant files, previously exam-

---

10. Unreported Memorandum opinion *United States v. Bernard Escamilla,* CR 73–5138 (D.S.D., March 22, 1975).

11. The Committee functioned with specific trial counsel during the Wounded Knee related trials in St. Paul, Minnesota, Sioux Falls, South Dakota, Lincoln, Nebraska, and Council Bluffs and Cedar Rapids, Iowa.

12. The informant issue was also raised unsuccessfully in *United States v. Crow Dog,* 399 F.Supp. 228 (N.D.Iowa 1975), *aff'd,* 532 F.2d 1182 (8th Cir. 1976), arising out of the Wounded Knee incident and the record and briefs in that case were part of the record before Judge Urbom in the *Fleury* and *Alvarado* cases.

ined by the District Courts, relating to the Schafers and Durham. We conclude, from this review and examination, that the trial courts did not err in holding that the activities of the informants and the FBI with respect to these appellants did not constitute misconduct requiring reversal, and that no prejudice to the appellants arising out of these activities has been shown.

■ The record clearly indicates that the termination of the relationship of the Schafers to AIM was at such time as to make any likelihood of invasion of an attorney-client relationship affecting these appellants virtually impossible. Moreover, the record shows clearly that the Schafers did not have access to legal records or strategy, or to conversations between these appellants and their attorneys or to any attorney work product.

■ The record is also void of evidence that Durham was present when defense strategy relating to the appellants was discussed. It is equally void of evidence that Durham examined the files of any of the appellants, or that he communicated any information to the FBI relating to the appellants' case or defense strategy. Moreover, there is nothing in the record to indicate that Durham was present in the communities where the appellants were tried

while the trials were underway. He was in Minnesota and Canada when the Fleury, Wesaw, Dodge and Johns trial took place in Lincoln, Nebraska. He was in California when the Alvarado and Williams trial was held in Lincoln, and he had been exposed as an informant by the time that Escamilla was tried in Council Bluffs, Iowa.

The most that can be said is that Durham served as an FBI informant during the months that the appellants' cases were being prepared and tried, that he occupied a position of responsibility in AIM and was a confidant of Dennis Banks, an AIM leader, during this period.[13]

■ Were we concerned on this appeal with the question of whether the convictions of Dennis Banks and Russell Means, tried in St. Paul, could be upheld, we would have another case. There is evidence in the record and FBI files to indicate that Durham was privy to numerous conversations between Banks and his lawyers, that he was present in St. Paul during the course of the trial, and that he was in constant communication not only with Banks and the other defendants during the trial, but with the FBI. As the record here is devoid of that type of close proximity to the defense of these appellants and as no prejudice has been shown, we refuse to set aside the

---

**13.** *Compare Black v. United States*, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966); *Bursey v. Weatherford*, 528 F.2d 483 (4th Cir. 1975); *United States v. Rispo*, 460 F.2d 965 (3rd Cir. 1972); *Caldwell v. United States*, 92 U.S.App. D.C. 355, 205 F.2d 879 (1952), *cert. denied*, 349 U.S. 930, 75 S.Ct. 773, 99 L.Ed. 1260 (1955); *Coplon v. United States*, 89 U.S.App.D.C. 103, 191 F.2d 749 (1951), *cert. denied*, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952).

In *Black*, the Supreme Court reversed the petitioner's conviction because the FBI had recorded conversations between the petitioner and his attorney relating to the charges pending against him and had transmitted information gained from the recording to the prosecuting attorneys.

In *Bursey*, the Fourth Circuit reversed the appellant's conviction because an undercover agent was a coindictee and participated in meeting between the appellant and his attorney. The agent subsequently testified against the appellant at trial after he was exposed as an informant.

In *Rispo*, the Third Circuit reversed the appellants' convictions because a codefendant served as a government informant before and during trial, and his attorney participated in joint defense strategy conferences with appellants' attorneys.

In *Caldwell*, the D.C. Circuit reversed the appellant's conviction because an informant hired by the prosecution served as a legal assistant in the preparation of the appellant's defense and the informant regularly reported matters concerning the impending trial to the prosecution.

In *Coplon*, the D.C. Circuit remanded the matter to the District Court to determine whether FBI agents had intercepted telephone conversations between the appellant and her counsel before and during trial, stating that a new trial would be required if such interceptions occurred, whether prejudice was shown or not.

convictions of the appellants because of the activities of the informants. In refusing to set the convictions aside, we adopt the view that absent actual prejudice, "there must be the actual gaining, rather than the mere opportunity for gaining of information relative to a charge against [a] defendant, and the information must be obtained by the informant from an intrusion into the attorney-client relationship." *United States v. Cooper*, 397 F.Supp. 277, 285 (D.Neb.1975).

## III. FLEURY, WESAW, DODGE AND JOHNS.

Mark Fleury, Colin Wesaw, Reginald Dodge, Jr., and Larry Johns appeal from their convictions of conspiracy to violate 18 U.S.C. § 231(a)(3).[14] They contend that there is insufficient evidence to establish that "they agreed to go to Wounded Knee, carrying weapons and ammunition to be used at Wounded Knee for the purpose of obstructing, impeding, or interfering with United States Marshals and Special Agents of the Federal Bureau of Investigation, who the defendants supposed were engaged in the lawful performance of their official duties incident to and during the commission of a civil disorder" as found by Judge Urbom sitting without a jury.

There is no direct evidence that the appellants had an agreement to go to Wounded Knee for the purpose of obstructing, impeding, or interfering with United States Marshals, Special Agents of the FBI or other law enforcement officials. The conviction must be sustained on the basis of circumstantial evidence. *See United States v. Overshon*, 494 F.2d 894, 895–896 (8th Cir.), *cert. denied*, 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974).

The record shows that Fleury entered the Larabee home on the Pine Ridge Reservation with the intent to coerce, by the threat of a rifle he was carrying, a ride to the Village of Wounded Knee if a ride was not voluntarily given. Failing to receive a ride, Fleury left the Larabee home, was joined by Johns, and shortly thereafter by Wesaw and Dodge. It further shows that the four men walked across the Larabee ranch in the general direction of Wounded Knee. A number of armed ranchers, summoned by Mrs. Larabee on a two-way radio, surrounded the appellants in a depression in the middle of a field on the ranch. The ranchers were joined shortly thereafter by two Bureau of Indian Affairs Police Agents. As these officers were alighting from their patrol car, two of the appellants fired shots in the general direction of the officers and the ranchers. The BIA Agents responded with M–16 automatic fire. The officers then identified themselves and ordered the appellants to come out. After a brief delay and another short exchange of gunfire, the appellants surrendered and were arrested. The arrest occurred on April 27, 1973.

After the appellants had been arrested and searched, the BIA officers went to the depression where the appellants had been. They found a 22 caliber rifle with the name "Reg Dodge" printed on it, a 12 gauge shotgun, ammunition consisting of forty-three 9 millimeter rifle cartridges, eighteen 22 caliber long rifle cartridges and several 12 gauge shotgun cartridges, a bow with Wesaw's name written on it and twelve arrows. They also found several backpacks containing clothes and minor medical supplies. A search of Dodge one hour after his arrest disclosed that he had several shotgun shells taped to his arm.

Wesaw, who was released after this initial arrest, was arrested a second time on May 8, 1973, at a government roadblock outside of Wounded Knee. The arrest occurred when he voluntarily turned himself in seeking medical attention for a female companion. Dodge, who was also released

---

14. 18 U.S.C. § 231(a)(3) provides:

Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function—[.]

after the initial arrest, was stopped and searched at a Wounded Knee roadblock on May 7th. He was found to be carrying ammunition on his person.

Other testimony shows that a civil disorder existed at Wounded Knee on April 27, 1973, that law enforcement officers were engaged in the performance of their duties at Wounded Knee on that day and that they were engaged in a federally-protected function.

On the basis of the above facts, viewed in the light most favorable to the government, we have no hesitancy in concluding that there is not substantial evidence to support the convictions of Wesaw and Johns. There is no evidence that they agreed with each other or with Fleury and Dodge to go to Wounded Knee for any purpose other than to join in the demonstrations then taking place. There is no evidence that either of them knew that a civil disorder existed at the reservation on April 27th, or that the United States Marshals or FBI Agents were on duty there. There is no evidence that Johns was armed, and the only evidence with respect to Wesaw in this regard is that he was carrying a bow and twelve arrows, hardly a weapon that one intending to interfere with a federal marshal or FBI Agent would carry. There is no evidence that either Wesaw or Johns was carrying ammunition, or that either was involved in Fleury's attempt to coerce Mrs. Larabee into transporting him to Wounded Knee, or that either fired shots at the BIA officers

when they were surrounded by ranchers and BIA officials on the Larabee ranch.[15] Under these circumstances, the requisite intent to violate § 231(a)(3) has not been shown.

We reach the same conclusion with respect to Fleury and Dodge. There is no evidence that they knew that a civil disorder existed on April 27th at Wounded Knee or that United States Marshals or FBI Agents were on duty in that community on that date. Absent such evidence, we find it difficult to see how they can be convicted of a conspiracy to violate § 231(a)(3).

Moreover, there is no direct evidence that Fleury and Dodge had agreed with each other, or with Johns and Wesaw, to go to Wounded Knee with an intent to obstruct or interfere with law enforcement officers in the lawful performance of their duties at that community. The existence of such an agreement can only be inferred from evidence that Fleury and Dodge were armed on the Larabee ranch on April 27th, and that they used the arms against Mrs. Larabee, ranchers and BIA Agents on that date. In our view, this evidence does not establish that they had agreed to obstruct or interfere with United States Marshals or FBI Agents at Wounded Knee.[16] It is one thing to attempt to coerce a civilian or to open fire on armed ranchers and BIA Agents (no § 231(a)(3) charge was brought for this incident) when surrounded in a field and quite another to infer from these facts that Fleury and Dodge would interfere with

15. Because there was no evidence as to who fired the shots at the BIA officers, the trial court granted motions for acquittal by each of the appellants to two counts of the joint indictment which charged them with assaulting these officers with a dangerous weapon in violation of 18 U.S.C. §§ 111 and 1114. The appellants were not charged with a substantive violation of § 231(a)(3) or with a conspiracy to violate that section with respect to their conduct on the Larabee ranch.

16. In view of the fact that the majority believes the evidence is insufficient to support the appellants' conviction, we need not consider the First Amendment implications of the appellants' conduct. In the appropriate case, we will examine the record in light of the Supreme

Court's language in *Noto v. United States,* 367 U.S. 290, 299–300, 81 S.Ct. 1517, 1522, 6 L.Ed.2d 836 (1961):

> [T]he requisite criminal intent * * * must be judged strictissimi juris, for otherwise there is a danger that one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share.

*See also Scales v. United States,* 367 U.S. 203, 229–230, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); *United States v. Spock,* 416 F.2d 165, 172–173, 178–179 (1st Cir. 1969).

United States Marshals and FBI Agents in the performance of their duties two weeks later at Wounded Knee.

No one can dispute the fact that Fleury and Dodge were anxious to get to Wounded Knee to associate themselves with other Indians in protesting governmental policies they considered to be unjust. But we cannot from that infer, that once at Wounded Knee, they would knowingly interfere with United States Marshals and FBI Agents in the lawful performance of their duties in that community.

Accordingly, we have no alternative but to reverse the convictions of Fleury and Dodge on this charge, as well as those of Johns and Wesaw.

## IV. ESCAMILLA.

Bernard Escamilla was charged with robbery and the use of a firearm in the commission of a felony. He was acquitted by a jury of these charges but found guilty of the lesser included offense of simple assault.

The facts leading to Escamilla's arrest and conviction can be briefly stated. On March 11, 1973, two local ranchers, named Charles Merrill and Louis Hanson, were stopped at a roadblock outside of Wounded Knee, South Dakota. They were ordered to get out of their truck by an armed man, later identified as appellant Escamilla. They were searched and the weapons carried in their truck were confiscated by Escamilla. They were then driven into Wounded Knee by Escamilla and led into a building known as the Museum. Merrill and Hanson were ordered to empty their pockets, were tied to a chair and subsequently released.

Escamilla asserts that the trial judge erred in failing to recuse himself. We denied the appellant's petition for mandamus on this issue, *Richard McArthur, et al. v. Bogue*, No. 75–1299 (8th Cir. April 29, 1975),

and the Supreme Court denied certiorari on May 12, 1975, *Escamilla v. Bogue*, 421 U.S. 968, 95 S.Ct. 1960, 44 L.Ed.2d 456 (1975).

We consider this appeal under 28 U.S.C. § 455 and 28 U.S.C. § 144. Section 455 states:

Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal or other proceeding therein.[17]

Section 144 states in part:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

Judge Bogue properly took the appellant's affidavits under advisement to determine "whether the facts alleged give fair support to the charge of bias and prejudice." *Pfizer v. Lord*, 456 F.2d 532, 537 (8th Cir.), *cert. denied*, 406 U.S. 976, 92 S.Ct. 2411, 32 L.Ed.2d 676 (1972). He determined they did not and promptly denied the motion. It is our duty on appeal to independently ascertain whether Escamilla's charges of bias and prejudice are legally sufficient to give "fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *Berger v. United States*, 255 U.S. 22, 33–34, 41 S.Ct. 230, 233, 65 L.Ed. 481, 485 (1921). For the purpose of determining the validity of Escamilla's allegations, we accept the truth of the facts recited in his affidavits. *United States v. Trevithick*, 526 F.2d 838 (8th Cir. 1976); *Parrish v. Board of Com'rs of*

---

**17.** This section was substantially amended by the Act of December 5, 1974, Pub.L. No. 93–512, § 1, 88 Stat. 1609. However, this amendment applies only to proceedings commencing after December 5, 1974, Pub.L. No. 93–512, § 3.

Escamilla was indicted on November 16, 1973, and his initial affidavit of prejudice alleging bias on the part of Judge Bogue was filed on December 24, 1973. We, therefore, consider this question under the old statute.

*Alabama State Bar,* 524 F.2d 98 (5th Cir. 1975) (en banc).

■ Escamilla asserts that Judge Bogue should have recused himself because:

(1) Judge Bogue recused himself in the case of Russell Means and Dennis Banks, which also arose out of incidents at Wounded Knee;

(2) Judge Bogue made derogatory comments about certain Indian spectators at an earlier civil trial;

(3) Judge Bogue made derogatory comments about certain members of AIM during a criminal trial which took place during the incident at Wounded Knee;

(4) Judge Bogue has made rulings in other criminal prosecutions arising out of Wounded Knee that one of Escamilla's attorneys alleges were improper;

(5) Judge Bogue failed to grant temporary injunctive relief sought by the Oglala Sioux Civil Rights Organization during the time of the incident at Wounded Knee; and

(6) Judge Bogue recused himself in an earlier criminal case concerning certain land located in the Black Hills in which he may have had a financial interest.

None of these allegations indicate that Judge Bogue possessed a personal bias or prejudice against Escamilla or the issues raised in his case. As to the first ground, the fact that Judge Bogue may have felt some prejudice against Means and Banks is not a basis in and of itself to show that he was prejudiced against Escamilla. The second and third grounds, which relate to comments made about Indian spectators and AIM do not indicate bias by Judge Bogue against Indians generally, members of AIM generally or this appellant specifically. As to the fourth ground, this relates to charges of one of Escamilla's attorneys that on certain occasions in 1973, Judge Bogue excluded the public from certain court proceedings so as to impair counsel's ability to represent his clients. Again, there is no allegation that Escamilla was involved in these proceedings in any way. As to the fifth ground, this relates to rulings in a civil matter during the incident at Wounded Knee where Judge Bogue denied certain relief sought by some of those involved in Wounded Knee, and there is no allegation that Escamilla was involved in this matter at all. As to the sixth ground, there is no allegation in this case that Judge Bogue has any potential financial interest in appellant Escamilla's case.

Finding no personal bias or prejudice in this record by Judge Bogue against Escamilla, we affirm his decision denying the motion for recusal.

Escamilla also contends that the trial judge prejudicially limited his right to confrontation by restricting his cross-examination of Merrill and Hanson. The defense counsel attempted to show the bias of these witnesses by questioning them about their attitude towards the occupants of Wounded Knee and of any actions they may have taken against the American Indian Movement or its supporters. The trial judge allowed cross-examination about their attitudes prior to the roadblock incident on March 11, 1973, but refused to allow questions or evidence as to the possible activities of Merrill and Hanson occurring after March 11, 1973, as it might pertain to their prejudice towards AIM or its followers.

■ The trial court has wide discretion as to materiality and relevancy. The exercise of this discretion in limiting cross-examination will not be reversed unless there has been a clear abuse of discretion coupled with a showing of prejudice to the appellant. *United States v. Brown,* 482 F.2d 1226, 1229 (8th Cir. 1973); *United States v. Cole,* 449 F.2d 194, 199 (8th Cir. 1971), *cert. denied,* 405 U.S. 931, 92 S.Ct. 991, 30 L.Ed.2d 806 (1972); *United States v. Bensinger Co.,* 430 F.2d 584, 591 (8th Cir. 1970).

■ The trial court allowed extensive cross-examination of these witnesses as to the identification of the appellant, their attitudes toward the occupation of Wounded Knee and of the general credibility of their testimony. We do not find prejudice or reversible error in the refusal to allow cross-examination into the actions subsequent to March 11, 1973, by these witnesses

either in support of or in opposition to the American Indian Movement.

Escamilla asserts that there was insufficient identification evidence. The record indicates that the sole witness identifying Escamilla was Charles Merrill. He initially identified the appellant from a group of police photographs within hours after he was released from Wounded Knee on March 11, 1973, and he subsequently identified the appellant from a second group of photos. Merrill also identified Escamilla at trial.

It is well established that the uncorroborated testimony of a single witness may be sufficient to sustain a conviction. *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *United States v. Montgomery,* 503 F.2d 55, 57 (8th Cir. 1974), *cert. denied,* 420 U.S. 910, 95 S.Ct. 830, 42 L.Ed.2d 839 (1975); *United States v. Cole, supra* at 197. Our review of the record indicates that there was sufficient identification testimony to go to the jury. The factual disputes between Merrill and the defense witness as to the identity of the person who assaulted him was properly a subject for the jury. *See United States v. May,* 419 F.2d 553 (8th Cir. 1969). We also find no reversible error in the manner of photographic identification of Escamilla by Merrill.

Escamilla also asserts error in the trial judge's refusal to give proposed instructions on identification. Escamilla suggested that two specific identification instructions be given. Proposed Instruction No. 3 states:

Identification may be made through the perception of any of the witness's senses, and it is not essential that the witness himself be free from doubt as to the correctness of his opinion. The identification testimony may be treated as a statement of fact by the witness: (1) if the witness had the opportunity to observe the accused; (2) if the witness is positive in his identification; (3) if the witness' identification testimony is not weakened by prior failure to identify or by prior inconsistent identification; and

(4) if, after cross-examination, his testimony remains positive and unqualified. In the absence of any of these four conditions, however, the witness' testimony as to identity must be received with caution and scrutinized with care. The burden of proof on the prosecution extends to every element of the crime charged, including the burden of providing beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime for which he stands charged.

Proposed Instruction No. 6 states:

A reasonable doubt may arise from the circumstances under which Merrill previously identified the defendant from photographs, such as the fact, if you so find, that his descriptions of the perpetrator varied from time to time or varied from defendant's actual appearance, or from the fact that he on one or more occasions described the perpetrator as an "Indian" and on one or more other occasions as a "Mexican," or from the fact that he identified some photographs of defendant but failed to identify others.

The trial court gave the following instruction on identification:

One of the most important issues in this case is the identification of the defendant as the perpetrator of the crime. The defendant has the burden of proving identity, beyond a reasonable doubt. It is not essential that the witness himself be free from doubt as to the correctness of his statement. However, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty.[18]

The trial court also gave the following instruction on credibility of a witness's testimony:

You should carefully study all the testimony given, the circumstances under

---

18. The reference to "defendant" was made inadvertently, and the judge subsequently re-

called the jury and properly charged them that it is the government's burden to prove identity.

which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief. Consider each witness's ability to observe the matters as to which he has testified and whether each witness is either supported or contradicted by other evidence in the case.

Appellant's Proposed Instruction No. 3 is based upon the suggested instruction set forth in *United States v. Barber,* 442 F.2d 517, 528 (3rd Cir. 1971), *cert. denied,* 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1972). This proposed instruction was used as a basis for the model identification instruction for the courts in the District of Columbia, set forth in *United States v. Telfaire,* 152 U.S.App.D.C. 146, 469 F.2d 552, 558–559 (1972). The Fourth Circuit in *United States v. Holley,* 502 F.2d 273 (4th Cir. 1974), and the Seventh Circuit in *United States v. Hodges,* 515 F.2d 650 (7th Cir. 1975), have adopted the *Telfaire* model instruction or its substantial equivalent in cases where there is no evidence of identification except eyewitness testimony.

■■■ We have previously considered the *Telfaire* instruction and have found "much to commend it in those cases in which eyewitness identification is essential to support a conviction." *United States v. Roundtree,* 527 F.2d 16, 19 (8th Cir. 1975). However, we do not find today that the failure of the trial court to give appellant's Proposed Instructions Nos. 3 and 6 constitutes reversible error. The trial court gave a specific instruction on identification that alerted the jury to the crucial nature of that issue in this case, and properly instructed them that they "must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him." The jury was also given a careful instruction on the credibility of witnesses.

The factual situation in this case also differs in important respects with those in *Holley* and *Hodges.* In *Holley,* the sole eyewitness who identified the defendant had earlier failed to select him out of a group of photographs and was finally able to identify him only under very suspect circumstances. In *Hodges,* the trial judge did not give a special identification instruction at all, although the principal issue in that case appears to have been one of identification. Here, we have a clear and positive identification of appellant by Merrill within several hours after the roadblock incident as well as a subsequent photograph identification and an in-court identification of Escamilla while he was seated in the spectator section of the court from among a number of similar looking persons. The trial judge here did give a special identification instruction along with a credibility instruction.

■■■ We remain, however, deeply concerned with the inherent fallibility of eyewitness identification and the great injustice that can arise from misidentification. *See Biggers v. Tennessee,* 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1968); *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Although we do not specifically adopt the *Telfaire* model instruction today, we will view with grave concern the failure to give specific and detailed instructions on identification in future cases where identification of the defendant is based solely or substantially on eyewitness testimony.

Finally, Escamilla asserts that the prosecutor made prejudicial remarks in his rebuttal argument. Our review of the record indicates that these remarks, read in context, were neither unfair nor prejudicial.

For the reasons stated above, we affirm the conviction of appellant Escamilla.

## V. ALVARADO AND WILLIAMS.

Alvarado and Williams contend on appeal that: (1) the United States does not have jurisdiction to try Indians on a charge of fourth degree burglary under 18 U.S.C. § 1153 and the South Dakota Criminal Code; (2) the government failed to prove that these appellants are Indians within the meaning of 18 U.S.C. § 1153; and (3) there was insufficient evidence to convict them.

On March 20, 1973, Morris Holyrock went to his father's home on the Pine Ridge Indian Reservation. On arrival, he observed that the home had been broken into. He also observed three men standing outside the house, a fourth man coming out of the house and a fifth man in the home. Holyrock asked one of the men, later identified as Williams, "Where's the old man?" Williams responded, "He went to Rapid City and told us we could use his house." Alvarado was standing approximately four feet away from Williams and ten feet away from Holyrock when this exchange took place, but did not respond to either the question or the answer. Holyrock then left and returned two hours later with four tribal policemen. The officers found Williams, Alvarado and codefendant Newman Crowels, Jr., in the home.[19] Food left in the home had been eaten, and two guns were missing.

Williams and Alvarado were convicted of knowingly breaking and entering into the home of Frank Holyrock, an Indian, without his permission with intent to commit larceny in violation of 18 U.S.C. § 1153 and S.D.C.L. §§ 22–32–11 and 22–32–13. Section 1153 states in part:

Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely  *  *  *  burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the

exclusive jurisdiction of the United States.

*    *    *    *    *    *

As used in this section, the offenses of burglary, assault with a dangerous weapon, assault resulting in serious bodily injury, and incest shall be defined and punished in accordance with the laws of the State in which such offense was committed.

South Dakota Compiled Laws § 22–32–11 states:

Every person who breaks and enters the dwelling house of another at any time in such manner as not to constitute burglary as otherwise specified in this chapter with intent to commit a crime is guilty of burglary in the fourth degree.

The appellants contend that the definition of fourth degree burglary found in § 22–32–11 describes a crime that is significantly less serious than common law burglary. They argue that 18 U.S.C. § 1153 creates federal criminal jurisdiction only over major crimes and that jurisdiction of this "relatively minor offense" (fourth degree burglary) should be left to the Indian tribal courts. They cite *United States v. Turley,* 352 U.S. 407, 411, 77 S.Ct. 397, 399, 1 L.Ed.2d 430, 433 (1957), and *United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886), in support of their position.

We rejected the appellant's argument in *Costello v. United States,* 255 F.2d 389, 393–394 (8th Cir.), *cert. denied,* 358 U.S. 830, 79 S.Ct. 52, 3 L.Ed.2d 69 (1958), and reject it here.[20] In *Costello,* the defendant contend-

---

19. The trial judge granted Crowels' motion for acquittal at the close of the government's case.

20. We considered *United States v. Turley,* 352 U.S. 407, 411, 77 S.Ct. 397, 399, 1 L.Ed.2d 430, 433 (1957), in *Costello v. United States,* 255 F.2d 389, 393 (8th Cir.), *cert. denied,* 358 U.S. 830, 79 S.Ct. 52, 3 L.Ed.2d 69 (1958). We stated:

Costello contends that the word burglary used in Section 901(6) must be given the meaning it had at common law and in any event does not include the crime Costello was shown to have committed in 1936. "Burglary, at common law, is the breaking ard entering, in the nighttime, of the dwell-

ing house  .  .  .  of another, with intent to commit a felony therein." [Citations omitted.]

The contention is not without weight as the Supreme Court has declared "that where a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common law meaning." *United States v. Turley,* 352 U.S. 407, 411–412, 77 S.Ct. 397, 399, 1 L.Ed.2d 430. But the Court in the same opinion declared that although criminal statutes are to be construed strictly "this does not mean that every criminal statute must be given the narrowest possible meaning in complete disregard of

ed that he could not be convicted of the offense of transporting firearms after having previously been convicted of a violent crime because his prior state conviction of burglary was based upon a statute which did not include all of the elements of common law burglary. We noted that at the time Congress passed the Federal Firearms Act, laws against burglary existed in practically all the states that included not only strict common law burglary but other lesser related offenses termed as forms of burglary. We concluded that Congress did not intend the word "burglary" to be given a strict common law definition and found no error in Costello's conviction of the Firearms Act.[21]

Here, § 1153 clearly states that burglary is to be "defined and punished in accordance with the laws of the State in which such offense was committed." Further, there is no legislative history that suggests an intent not to include what is classified in South Dakota as fourth degree burglary as outside the jurisdiction basis of § 1153. It follows that the District Court had jurisdiction. *Accord, United States v. Gilbert,* 378 F.Supp. 82, 89–94 (W.D.S.D.1974).[22]

The appellants also assert error in the finding by the trial court that they are Indians within the meaning of § 1153. They assert there was insufficient evidence to prove they were Indians, they are not Indians as a matter of law and that the trial court erred in ruling on this issue and not allowing this issue to go to the jury.

The evidence clearly indicates that Alvarado is one-fourth Yurok Indian by blood and that he filed an application to be recog-

nized as a member of the Yurok Tribe on the California State Judgment Rolls on September 19, 1969. He stated on that application that he had been previously entered on a judgment roll in 1950, and that he knew that roll number. The Superintendent of the Pawnee Agency testified that appellant Williams was listed on the Pawnee tribal roll, and that an applicant must have at least one-fourth Pawnee blood to be so enrolled.

The definition of exactly who is and who is not an Indian is very imprecise. F. Cohen, *Federal Indian Law* (1958), at 4–12. Courts have generally followed the test first discussed in *United States v. Rogers,* 45 U.S. 567, 11 L.Ed. 1105 (1845): in order to be considered an Indian, an individual must have some degree of Indian blood and must be recognized as an Indian. *See State v. Attebery,* 110 Ariz. 354, 519 P.2d 53 (1974). In determining whether a person is recognized as an Indian, courts have looked to both recognition by a tribe or society of Indians or by the federal government. *Federal Indian Law, supra,* at 776.

The Supreme Court has held that a child of a white father and an Indian mother could inherit the mother's share of tribal property. *Halbert v. United States,* 283 U.S. 753, 51 S.Ct. 615, 75 L.Ed. 1389 (1931). Other federal cases have held that one-fourth to three-eighths blood, *Vezina v. United States,* 245 F. 411 (8th Cir. 1917), or one-eighth to one-fourth blood, *Sully v. United States,* 195 F. 113 (8th Cir. 1912), is sufficient to be enrolled as a member of a tribe and to be entitled to benefits as such.

In the more recent case of *Makah Indian Tribe v. Clallam County,* 73 Wash.2d 677,

the purpose of the legislature." It is appropriate to consider the purpose of the Act.

**21.** The appellants' reliance upon *United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886), is also unconvincing. There; the Court referred to the crimes set forth in the predecessor to 18 U.S.C. § 1153 as common law crimes. However, the Court also recognized the power of Congress to alter and expand this statute as it saw fit. The subsequent amendments to 18 U.S.C. § 1153 instructing that offenses, including burglary, be defined and punished in accordance with state law re-

move whatever limitations strict common law definitions may have imposed.

**22.** We recognize, as did the Courts in *Costello v. United States, supra* at 394, and *United States v. Gilbert,* 378 F.Supp. 82, 91 (D.S.D. 1974), that a state may at some time define burglary in a manner so devoid of its common law meaning that a court could not permit that state law to apply. That question need not be determined here as S.D.C.L. § 22–32–11 does not suffer from such a deficiency.

440 P.2d 442 (1968), the court found a woman of one-fourth Makah blood, who held herself out as a member of that tribe, to be an Indian. *Accord, State v. Attebery, supra.*

We find that both Williams and Alvarado are of Indian blood and have held themselves out to be Indians. We, therefore, affirm the decision of the trial court in determining that they are Indians within the meaning of 18 U.S.C. § 1153. We find no error in the trial judge determining this jurisdictional issue.

We also find no merit to the appellants' claim that there was insufficient evidence to prove that they intended to commit burglary. The appellants had not, as they alleged, been given permission to use the home. They were initially found standing outside the home and subsequently found to have occupied it. The padlock on the door was broken, food stored in the home had been eaten and weapons kept there had been removed.

We likewise find no merit to their claim that there was insufficient evidence to find that the building was a dwelling house under S.D.C.L. § 22–32–14. The building was clearly used from time to time as a dwelling by the senior Holyrock. No further occupancy is required to bring it under the protection of S.D.C.L. § 22–32–14.

We affirm the convictions of Williams and Alvarado.

WEBSTER, Circuit Judge (concurring in part and dissenting in part).

I concur in Part I (Jurisdiction) and Part II (Informant) of the majority opinion. I also concur in Part V affirming the convictions of Alvarado and Williams.

I concur in so much of Part IV as affirms the conviction of Escamilla, but I decline to join in the majority's cautionary remarks

with respect to jury instructions on eyewitness identification.

I dissent from Part III reversing for insufficiency of evidence the conspiracy convictions of Fleury, Wesaw, Johns, and Dodge.

A.

*Nos. 75–1173 and 75–1498*

The majority reverses the conspiracy convictions in these court-tried cases on the basis of insufficiency of evidence.

Both the existence of a conspiracy and a defendant's participation in that scheme may be established by circumstantial evidence. *United States v. Overshon*, 494 F.2d 894, 895–96 (8th Cir.), *cert. denied*, 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974); *Langel v. United States*, 451 F.2d 957, 961 (8th Cir. 1971); *Jacobs v. United States*, 395 F.2d 469, 472 (8th Cir. 1968). It is now well-established that circumstantial evidence is no less probative than direct evidence and that its sufficiency in criminal cases is to be measured by the reasonable doubt standard. *See Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 137, 99 L.Ed. 150, 166 (1954); *United States v. Nelson*, 419 F.2d 1237, 1239–41 (9th Cir. 1969). The convictions should stand if inferences from evidence of the relationship between the parties and of overt acts, conduct, and other probative circumstances establish agreement beyond a reasonable doubt. *See, e. g., United States v. Hutchinson*, 488 F.2d 484, 490 (8th Cir. 1973), *cert. denied*, 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974); *United States v. Nelson, supra*, 419 F.2d at 1239–41. Indeed, wide latitude has been allowed the district courts in admitting evidence tending to establish a conspiracy, since no express communication of agreement is required. *See generally Developments in the Law—Criminal Conspiracy*, 72 Harv.L.Rev. 920, 984 (1959).[1]

---

1. In my view, 18 U.S.C. § 231(a)(3) does not apply to acts arguably protected by the First Amendment, *see United States v. Mechanic*, 454 F.2d 849, 852 (8th Cir. 1971), *cert. denied*,

406 U.S. 929, 92 S.Ct. 1765, 32 L.Ed.2d 131 (1972). Therefore, a review of the present convictions does not require the stricter standards of proof delineated in *Scales v. United States*,

Applying this standard of review, I would have no difficulty in sustaining the convictions of Fleury, Wesaw, Dodge, and Johns for conspiracy to violate 18 U.S.C. § 231(a)(3). The principal evidence of conspiracy, viewed in the light most favorable to the convictions, see *United States v. Cummings*, 507 F.2d 324, 329 (8th Cir. 1974), is as follows:

On April 27, 1973, there was a condition of civil disorder at the Village of Wounded Knee, South Dakota, in the Pine Ridge Indian Reservation, and federal law enforcement officers were engaged in lawful performance of their duties in attempting to quell the disorder. Approximately ten miles to the northeast of Wounded Knee was the ranch on which James and Joanne Larabee resided. At 11:15 a.m. that day, Mark Fleury entered the Larabee house armed with a rifle and attempted to coerce Mrs. Larabee, who was alone with her children, to provide automobile transportation to Wounded Knee. According to Mrs. Larabee, Fleury stated that "we" needed a ride to Wounded Knee. Mrs. Larabee managed to radio her husband for help, and Fleury departed in haste. From her doorway, Mrs. Larabee observed Larry Johns standing immediately outside the door. Fleury and Johns walked away from the house and were soon joined by Colin Wesaw and Reginald Dodge. The four were observed walking in the direction of Wounded Knee.

A number of armed ranchers arrived in response to the call for assistance. They observed that the four defendants were armed and surrounded them at a distance. The defendants were located in the cover of a natural depression. Two Bureau of Indian Affairs police officers arrived in a marked patrol car and utilized a loudspeaker to inform the defendants of their presence and to order them to surrender. Two of the defendants responded with a discharge of firearms, whereupon the officers returned fire into the trees above their heads and again ordered the defendants to surrender. After a brief delay, shots were again exchanged and shortly thereafter the defendants surrendered and were arrested.

A search of the area in which the defendants had been located disclosed a loaded rifle and shotgun, matching ammunition, non-matching rifle ammunition, and a bow and arrows. Several backpacks containing clothes and minor medical supplies were also discovered. A search of Dodge revealed a band of shotgun shells taped to his arm.

Immediately after their surrender, both Johns and Fleury asked ranchers the directions to Wounded Knee, and Johns stated: "We shouldn't have shot at those guys." Fleury stated to one of the ranchers: "We are going to win at Wounded Knee no matter what you do."

The defendants were apparently released sometime after the arrest. On May 7, 1973, Dodge was stopped and searched at a roadblock at Wounded Knee, and was found to be carrying substantial amounts of ammunition as well as a letter addressed "To All Brothers in Wounded Knee". This petition of support was signed by Fleury and four other individuals. On May 8, 1973, Wesaw was arrested at a Wounded Knee roadblock while attempting to gain medical aid for another.

The evidence established that the defendants had agreed to travel to Wounded Knee and that they knew that it was the scene of a civil disorder involving federal officers. The circumstantial evidence of the intent of the defendants to violate 18 U.S.C. § 231(a)(3) by obstructing, impeding, or interfering with federal officers at Wounded Knee is substantial: (1) the possession of weapons and ammunition while traveling to Wounded Knee; (2) the willingness of defendants to engage in a firefight with federal officers at the Larabee ranch; (3) the willingness of at least Fleury and Johns

367 U.S. 203, 229–32, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961), and *Noto v. United States,* 367 U.S. 290, 299–300, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961). Evidence of knowledge of the conspiracy and an intent to violate 18 U.S.C.

§ 231(a)(3) may be established by any relevant evidence, direct or circumstantial, which satisfies the trier of fact of the guilt of the defendant beyond a reasonable doubt.

to violate state, and possibly federal, law in order to get to Wounded Knee by coercing a ride from Mrs. Larabee; (4) Fleury's statement that "We are going to win at Wounded Knee no matter what you do"; and (5) the May 7th and 8th occurrences at Wounded Knee roadblocks.[2] It seems difficult to imagine in the face of such conduct that the defendants lacked the requisite knowledge of or intent to join in a conspiracy to obstruct, impede, or interfere with federal officers in the lawful performance of their duties.[3] *See United States v. Nelson, supra*, 419 F.2d at 1239. As the District Court found: "No other reasonable inference can be drawn from the evidence as to the purpose of the defendants acting in concert, as they did, with the weapons and ammunition they possessed."

I, therefore, respectfully dissent from the finding of insufficient evidence, and would affirm the convictions.

### B.

### No. 75–1398

I concur in the holding that the refusal of the District Court to give Bernard Bravo Escamilla's proposed eyewitness identification instructions did not constitute reversible error. While I further agree that the fallibility of eyewitness identification is an appropriate concern in cases where identification of a defendant is based solely on eyewitness testimony, I cannot concur with the majority insofar as it intimates that the failure to give instructions similar to the *Telfaire* model instructions [4] will be inherently suspect.

Neither the *Telfaire* model instructions nor what the majority terms "specific and detailed" identification instructions have ever been required in this circuit. Rather, we have consistently aligned with those circuits which leave the matter of *giving* an identification instruction, as well as the specificity thereof, to the discretion of the district court. *Cullen v. United States*, 408 F.2d 1178, 1181 (8th Cir. 1969); *Jones v. United States*, 358 F.2d 383, 385–86 (8th Cir. 1966). *See United States v. Sambrano*, 505 F.2d 284, 286–87 (9th Cir. 1974); *United States v. Evans*, 484 F.2d 1178, 1187–88 (2d Cir. 1973). Assuming adequate opportunity for cross-examination, summation, and appropriate burden of proof and credibility instructions, as was the case here, it seems inappropriate to preempt the reasoned discretion of the district courts by holding that "grave concern" will necessarily result from the failure to utilize "specific and detailed" eyewitness identification instructions. Such a result is tantamount to adoption of the *Telfaire* instructions, an indulgence which the majority expressly disclaims.

---

**2.** Evidence also established that at least Fleury, Wesaw, and Dodge were sympathizers and possibly members of the American Indian Movement (AIM) and that AIM had a significant connection with the civil disorder at Wounded Knee. While guilt cannot be established by association alone, *see United States v. Cohen*, 489 F.2d 945, 948 (2d Cir. 1973), this evidence is nonetheless probative of the purpose, scope, and existence of the conspiracy as well as the intent of these specific individuals with respect to the conspiracy.

**3.** While this evidence is not as substantial as to Wesaw and Johns as it is to Fleury and Dodge,

it is well settled that once the existence of a conspiracy is established, even slight evidence connecting other defendants to the conspiracy may be sufficient proof of involvement in the scheme. *See United States v. Overshon*, 494 F.2d 894, 896 (8th Cir.), *cert. denied*, 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974); *United States v. Hutchinson*, 488 F.2d 484, 490 (8th Cir. 1973), *cert. denied*, 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974); *Langel v. United States*, 451 F.2d 957, 961–62 (8th Cir. 1971).

**4.** *United States v. Telfaire*, 152 U.S.App.D.C. 146, 469 F.2d 552, 558–59 (1972).