DeWitt DILLON, Harlen Iron, Walt Pease, Eddie Alden, Vincent Charles, Owen Snell, Alden Big Man, Benjamin Big Man, Tim Rondeau, Robert Other Medicine, Willis Medicine Horse, Phillip White Clay, Harlan Reed, Paul Deputee, Vern E. Gibbs, Loretta L. Bell, John Doe, Jane Doe, and all others similarly situated, Plaintiffs,

v.

The STATE OF MONTANA, Robert L. Woodahl, Acting as Attorney General, and the Department of Revenue of the State of Montana, Keith Colbo, Director, and Joe Does, Jane Does, and John Doe Corporations, Defendants.

Civ. No. 1188.

United States District Court, D. Montana, Billings Division.

May 3, 1978.

---

43. *City of Lafayette v. Louisiana Light & Power Co., supra* n.23, ·· U.S. at ————, 98 S.Ct. at 1123.

Thomas J. Lynaugh, Thomas K. Schoppert, Lynaugh, Fitzgerald, Schoppert, Skaggs & Essman, Billings, Mont., for plaintiffs.

Mike Greely, Atty. Gen. for the State of Montana, Robert W. Corcoran, R. Bruce McGinnis, State Dept. of Revenue, Helena, Mont., for defendants.

BATTIN, District Judge.

The plaintiffs are Indians purporting to represent various subclasses of Indians employed within the confines of Indian reservations in Montana. They brought this class action seeking a declaration that the State of Montana may not constitutionally impose its income tax on income earned by Indians on a federally recognized reservation. The complaint also seeks an injunction against collection of the tax and a refund of taxes allegedly illegally collected since 1968.

Defendants' motion to dismiss for want of jurisdiction was denied by order of the Court dated June 24, 1976. That order also expressed the Court's agreement that the action be maintained as a class action. Thereafter, the case was submitted for disposition on cross-motions for summary judgment.

## I. *Motion to Reconsider*

The defendants have moved the Court to reconsider its July 1, 1976 order directing that this case be resolved by summary judgment on grounds that the complexity and importance of the issues herein require a trial. The defendants' motion to reconsider is denied. The question presented here is purely one of law: What is the reach of the Supreme Court's decision in *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)? The plaintiffs have filed responses to interrogatories which detail the factual status of each plaintiff, and the defendants have stipulated that additional plaintiffs may be added to ensure that each subclass is adequately represented. Summary judgment is thus an appropriate remedy, as no further factual exposition is necessary to resolve the legal question. *See,* 6 *Moore's Federal Practice,* ¶ 56.16, at 661 (2nd ed. 1976).

## II. *Class Action*

Conditional consent to the maintenance of this lawsuit as a class action was given in the order of this Court dated June 24, 1976. The parties have increased the number of subclasses by stipulation so that now the plaintiffs purport to represent six separate groups. Maintenance of this case as a class action is permissible.[1]

It is clear from the Supreme Court's analysis in *McClanahan* that the State's power to tax on-reservation income of an Indian is dependent on the peculiar relationship between the reservation in question and the federal government. Here, the plaintiffs are, with one minor exception,[2] all employed within the confines of the Crow Reservation. No treaty or statute dealing with any other Montana reservation is cited.

---

1. The prerequisites to maintenance of a class action are present. The class of Indians employed on the Crow Reservation is too large to permit joinder of all its members. The questions of law presented here are common to the entire class. The interests of the subclasses are adequately represented, since each subclass has at least one nominative plaintiff as a member. Finally, the State of Montana has consistently taxed the members of the plaintiff class

despite their Indian status. Declaratory and injunctive relief provides an appropriate remedy. This action is therefore properly maintained as a class action under F.R.Civ.P. Rule 23(b)(2).

2. Plaintiff DeWitt Dillon apparently earned income in two tax years from within the boundaries of the Northern Cheyenne Reservation.

The issue under consideration is confined to the application of Montana's income tax laws to income earned by members of the following subclasses of the class of Indians employed within the boundaries of the Crow Indian Reservation because it is unclear whether these plaintiffs adequately or properly represent the interests of Indians employed elsewhere than on the Crow Reservation:

(A) Enrolled members of the Crow Tribe who reside on and derive their entire income from within the boundaries of the Crow Reservation;

(B) Enrolled members of the Crow Tribe who derive their entire income from within the boundaries of the Crow Reservation but who reside off the Crow Reservation;

(C) Enrolled members of a federally recognized tribe, other than the Crow Tribe, who reside on and derive their entire income from within the boundaries of the Crow Reservation;

(D) Enrolled members of a federally recognized tribe, other than the Crow Tribe, who derive their entire income from within the boundaries of the Crow Reservation, but who reside off the Crow Reservation;

(E) Indian persons, not enrolled as a member of any federally recognized tribe, who reside on and derive their entire income from within the boundaries of the Crow Reservation;

(F) Indian persons not enrolled as a member of any federally recognized tribe, who derive their entire income from within the boundaries of the Crow Reservation but who reside off the reservation.

### III. *Discussion*

The leading case on state taxation of Indian income is *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). In *McClanahan*, the plaintiff was an enrolled member of the Navajo Tribe residing on the Navajo Reservation. She earned all of her income for 1967 from her employment on the reservation. She filed an administrative protest against the withholding of state income tax from her reservation wages. When no relief was forthcoming, she brought a class action in state court, demanding refund of the taxes withheld and a declaration that the state lacked authority to collect the tax.

The Arizona court dismissed for failure to state a claim, and the state Supreme Court affirmed. That court held, on the basis of *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), that the collection of state income tax was proper since it did not infringe on the "rights of the Navajo tribe of Indians to be self-governing."

On certiorari, the Supreme Court reversed. The Court confined its inquiry to "the narrow question whether the State may tax a reservation Indian for income earned exclusively on the reservation." 411 U.S. at 168, 93 S.Ct. at 1260. The Court concluded that Congress had not conferred upon the State the power to tax.[3] Further support for the Court's conclusion was found in the recognition of Indian tax exemptions in the provisions of the Buck Act, 4 U.S.C. § 105, *et seq.* It noted the general authority to impose state taxes within federal areas does not "authorize the levy or collection of any tax on or from any Indian not otherwise taxed." 4 U.S.C. § 109. Finally, the Court observed that Arizona had not assumed civil or criminal jurisdiction over the Navajo Reservation under 25 U.S.C. § 1322, and that it apparently lacked any means with which to collect the tax. The Court held that these factors foreclosed any grant of tax jurisdiction to the State of Arizona.

■ A most significant aspect of the *McClanahan* decision is the Court's analysis

---

**3.** The treaty creating the Navajo Reservation was found to have set the land aside "within the exclusive sovereignty of the Navajos under general federal supervision." *Id.* at 175, 93 S.Ct. at 1263. Further, the Arizona Statehood Enabling Act provided that Arizona would "forever disclaim" any right or title to Indian lands. The Act provided the powers to tax Indian property only if it were outside the boundaries of the reservation.

of the concept of tribal sovereignty,[4] a touchstone of Indian law decisions since the time of John Marshall. *See, e. g., Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). The rule laid down in *McClanahan* was summarized by the Ninth Circuit in *Fort Mojave Tribe v. San Bernardino County,* 543 F.2d 1253 (9th Cir. 1976), *cert. denied* 430 U.S. 983, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1977). The Court stated:

> Although the Indian sovereignty doctrine is still relevant, "because it provides a backdrop against which the applicable treaties and federal statutes must be read," it is no longer the major focus of analysis. *McClanahan,* [411 U.S.] at 172 [93 S.Ct. 1257]. . . . Instead we must carefully analyze the applicable federal statutes to determine whether state action has been pre-empted. If not, the state statute need only satisfy the [*Williams* test], *viz.* that it not infringe on the rights of reservation Indians to make their own laws and be ruled by them.
>
> 543 F.2d at 1255–56.

In applying the *McClanahan* analysis, it is necessary to examine the applicable treaties and statutes to determine if taxation of the reservation income of a nonresident or an unenrolled Indian is consistent with the extent of the state's power. If statutory power exists, and if its exercise does not infringe upon tribal self-government, the tax may be imposed.

**4.** The Court described the analytical process as follows:

> [T]he trend had been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption. . . . The modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power.
>
> 411 U.S. at 172, 93 S.Ct. at 1262.

**5.** The State promptly incorporated the rationale of *McClanahan* into its income tax regulations by providing that Indians who reside and are enrolled on a reservation are not subject to state income tax on income earned on the reservation.

**6.** A negative answer on either question will disqualify any plaintiff having that trait from the alleged tax exemption—that is, if tribal

### A.

Montana has apparently conceded that Congress's treatment of the Crow Reservation is substantially similar to that of the Navajos as outlined in *McClanahan.*[5] The treaty creating the Crow Reservation provides that the reservation land be "set apart for the absolute and undisturbed use and occupation of the Indians." 15 Stat. 649. Montana's Enabling Act, 25 Stat. 676, and Constitution contain provisions closely paralleling those cited in *McClanahan* as being strongly indicative of a Congressional intent to withhold from the state the authority to tax within reservation boundaries. These provisions place this case squarely within the rules of the *McClanahan* case with respect to enrolled Crows residing on the reservation. Do the additional factors of lack of enrollment or lack of residency require application of a different rule?[6]

### B.

Residency on the reservation is a requirement to bring a particular taxpayer within the rule announced in *McClanahan.* The decision in *McClanahan* is based on the territorial principles which go back to Mr. Chief Justice Marshall's opinion in *Worcester v. Georgia, supra.*[7] *McClanahan* holds that where Congress has set aside a portion of territory within a state and retained absolute jurisdiction of the tribes, the

enrollment is a requirement under *McClanahan,* unenrolled Indians are disqualified whether they reside on the reservation or not. Likewise, if reservation residence is required for the exemption to apply, an enrolled nonresident is subject to tax as fully as an unenrolled nonresident. It follows that resolution of these two questions will dispose of all five of the disputed subclasses, since each has at least one of the fatal traits.

**7.** *Worcester* concerned the application of Georgia's criminal laws within the exterior boundaries of the Cherokee Nation. Mr. Chief Justice Marshall wrote for the Court that the Indian tribes were "distinct, independent political communities" and that the states had no power to enforce criminal laws within the territorial jurisdiction of the tribes.

state's taxing authority is preempted. The principle applies here. The Fort Laramie Treaty of 1868 set aside the Crow Reservation for the exclusive use of the Indians, and Montana's Enabling Act recognizes the exclusive jurisdiction of the tribes and the federal government. Within the jurisdictional enclave of the reservation, the State has no power to impose its tax.

■ The distinction between the plaintiff in *McClanahan* and the plaintiffs representing Subclasses B, D and F here is that the tax imposed here is imposed outside the boundaries of the reservation. The situs of the income is where the taxpayer lives, not where he works. Thus, the State is not attempting to impose its taxing authority within the exclusive jurisdiction of the United States and the tribes. It only seeks to tax those within the reach of its taxing power.[8]

It is somewhat significant that the employers who withhold the tax are located on the reservation. The basic vehicle for collection of state income tax is found in the withholding tax provisions of Title 84, Chapter 49, Revised Codes of Montana, 1947 (hereafter cited as R.C.M.), which provide civil and criminal remedies for violations. *See, e. g.,* R.C.M. § 84–4943. Since the State of Montana generally lacks civil and criminal jurisdiction over Indians on the Crow Reservation, *Kennerly v. District Court,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971), *Crow Tribe v. Deernose,* 158

Mont. 25, 487 P.2d 1133 (1971), there appears to be no way to apply the State's normal tax collection machinery to any employee of an on-reservation Indian enterprise.

■ Tax enforcement jurisdiction on the Crow Reservation is neither a theoretical nor a practical deterrent to the imposition of income tax on the members of Subclasses B, D and F. The state income tax imposes a liability on the employee, not the employer. If the tax is not paid through withholding, the state may nonetheless execute and levy on the property of Indians residing off the reservation to ensure collection of the tax. Thus, unlike the situation considered in *McClanahan*,[9] there exists a method of enforcement of tax against members of Subclasses B, D and F. Indians who reside off the reservation are subject to state income tax for their income earned on the reservation.

### C.

Nonresidence resolves the issues here with respect to Subclasses B, D and F. However, are Indian persons who reside on reservations but are either unenrolled or are enrolled on a reservation other than the one on which they reside, covered by the *McClanahan* exemption?

There is at least one case on point.[10] In *Fox v. Bureau of Revenue,* 87 N.M. 261, 531

**8.** In *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), the Supreme Court held that a state may tax Indian enterprises off the reservation. "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State. . . . That principle is as relevant to a State's tax laws as it is to state criminal laws . . . ." 411 U.S. at 148–149, 93 S.Ct. at 1270–71.

**9.** The Court there stated:
[A] startling aspect of this case is that appellee apparently concedes that, in the absence of compliance with 25 U.S.C. § 1322(a), the Arizona courts can exercise neither civil nor criminal jurisdiction over reservation Indians. . . . But the appellee nowhere explains how, without such jurisdiction, the State's tax may either be imposed or collected. . . . Unless the State is willing to defend the position that it may constitutionally administer its tax system altogether without judicial intervention . . . , the admitted absence of either civil or criminal jurisdiction would seem to dispose of the case.
411 U.S. at 178–179, 93 S.Ct. at 1266.

**10.** The case of *Omaha Tribe v. Peters,* 516 F.2d 133 (8th Cir. 1975), is distinguishable. In that case, the Court held that 28 U.S.C. § 1360 operated as an affirmative grant of taxing jurisdiction over reservation Indians in Nebraska. Montana, unlike Nebraska, has not assumed jurisdiction over its Indian reservations under 28 U.S.C. § 1360.

P.2d 1234 (1975), *cert. denied* 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976), the taxpayer was an enrolled Comanche residing and working on the Navajo Reservation. She appealed from the Bureau's denial of her claim for a tax refund. The New Mexico Court of Appeals reversed, holding that an Indian person residing on a reservation was a "reservation Indian" for purposes of the holding in *McClanahan,* regardless of enrollment. The Court stated:

> We have neither found nor been directed to a single case where it was regarded crucial that the Indian in question, although located on a reservation, was not a member of the tribe to which the reservation belonged. In the few cases thus far decided, tribal affiliation was held to be of no importance as long as there was a coalescence of . . . two facts—status as an Indian and situs on a reservation.
>
> 531 P.2d at 1235.

The Court then reviewed applicable precedent from both the state and federal courts, concluding:

> In view of the United States' "solemn commitment toward the Indians," *Morton v. Mancari,* supra [417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)], it is our opinion that taxpayer's status is that of "reservation Indian" within the meaning of the *McClanahan* case. The fact of the coalescence of status and situs announced in *McClanahan* is controlling.
>
> 531 P.2d at 1236.

The holding in *Fox* is consistent with the territorial principles expressed in *McClanahan.* State tax laws have no application to Indians residing and earning money on a reservation under the exclusive jurisdiction and control of the tribes and the federal government. The language of the Crow treaty which sets aside the reservation for the Crows and *"for such other friendly tribes* of individual Indians as from time to time they may be willing, with the consent of the United States to admit amongst them . . . ."* suggests that this rule should apply to other Indians residing on the Crow Reservation. Even though this language refers to "tribes" of Indians, it is significant for purposes of this case because it indicates that the protections of the Crow treaty may inure to the benefit of non-Crow Indians.

The Congress and the courts have recognized that the special status of Indians attaches in some cases even when an Indian is on a reservation other than his own. Thus, the State of Arizona was found to have no power to arrest and extradite a Cheyenne Indian residing on the Navajo Reservation. *Arizona ex rel. Merrill v. Turtle,* 413 F.2d 683 (9th Cir. 1969), *cert. denied* 396 U.S. 1003, 90 S.Ct. 551, 24 L.Ed.2d 494 (1970). Exclusive federal criminal jurisdiction under 18 U.S.C. § 1153 has been held to attach to offenses where the perpetrator was not enrolled on the reservation on which the offense occurred. *Ex parte Pero,* 99 F.2d 28 (7th Cir. 1938), *cert. denied sub nom. Lee v. Pero,* 306 U.S. 643, 59 S.Ct. 581, 83 L.Ed. 1043 (1939). See also, *In re Carmen,* 165 F.Supp. 942 (N.D.Cal.1958), *aff'd sub nom. Dickson v. Carmen,* 270 F.2d 809 (9th Cir.), *cert. denied* 361 U.S. 934, 80 S.Ct. 375, 4 L.Ed.2d 355 (1959).

The decision in *Fox* is well-reasoned and should be followed. If the taxpayer is an Indian who resides on a reservation set aside for the exclusive use of the Indians under joint federal-tribal control, the income earned on the reservation is beyond the state's taxing power whether the taxpayer is enrolled on the reservation or not.

### D.

Which reservation residents benefit from the tax exemption recognized here? *McClanahan* establishes that enrolled Crows are state tax free. On the other hand, non-Indians residing and employed on the reservation are not tax free. The holding of *Fox* is that income earned on a reservation by reservation Indians is free from state tax. The question arises as to how the phrase "reservation Indians" is to be defined. Cases, statutes and regulations vary in defining Indian status according to the particular problem confronted. The common denominator is that special

considerations of Indian status are only available to those Indians who have maintained the "unique legal status" which distinguishes Indian citizens from all other Americans. *See, Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

■ Several factors must be considered. The taxpayer must have some percentage of Indian blood. A non-Indian who adopts Indian ways or is adopted into an Indian tribe has generally been held not entitled to the protection of the special status which exists between the Federal Government and the Indians. *See, Alberty v. United States*, 162 U.S. 499, 16 S.Ct. 864, 40 L.Ed. 1051 (1896); *United States v. Rogers*, 45 U.S. (4 How.) 567, 11 L.Ed. 1105 (1846).

■ An Indian whose wardship status has been terminated, either by his own actions in leaving the reservation to embrace a different culture or by an Act of Congress terminating tribal status, is not entitled to protection. *United States v. Heath*, 509 F.2d 16 (9th Cir. 1974). In *Heath*, the defendant was charged with homicide under statutes covering offenses committed by Indians against other Indians in Indian country. The defendant contended there was no federal jurisdiction because her status as an Indian person was terminated by the Klamath Termination Act, 25 U.S.C. § 564. The Ninth Circuit agreed. The Court noted that the Klamath Act was intended " 'to (a) end federal supervision, (b) to remove from the Indians their special status as Indians, and (c) make laws applicable to them "in the same manner as they apply to other citizens . . ." ' " 509 F.2d at 19, quoting *Klamath and Modoc Tribes v. Maison*, 338 F.2d 620, 622 (9th Cir. 1964). The Court found that exclusive federal jurisdiction under the Major Crimes Act arose not from the defendant's racial status as an Indian but because he was a member " 'of certain social-political groups towards which the Federal Government has assumed special responsibilities.' " 509 F.2d at 19, quoting *F. Cohen, Handbook of Federal Indian Law* 5 (1942) [hereinafter cited as *Cohen*]. Since the special relationship between the federal government and defendant's tribe had been terminated, the Court concluded that she was not an Indian person within the meaning of the Major Crimes Act.

The individual's status in society is significant. While some courts have discussed this factor in terms of holding oneself out as an Indian, *see, United States v. Dodge*, 538 F.2d 770, 787 (8th Cir. 1976), *cert. denied sub nom. Cooper v. United States*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 547 (1977), the general test has been phrased as one of recognition. *See, Cohen* at 6. Whichever approach is used, a person must be identified by society as an Indian and must accept that identification before the "unique legal status" of Reservation Indian may be invoked.

■ It is suggested that the Court should adopt the definition promulgated in *Cohen* and described as the general rule in the *Dodge* case, 538 F.2d at 787:

Recognizing the possible diversity of definitions of Indianhood some practical values nevertheless may be found in a definition of Indian as a person meeting two qualifications: (a) That some of his ancestors lived in America before its discovery by the Europeans, and (b) that the individual is considered an Indian by the community in which he lives.

*Cohen* at 6.

The *Cohen* definition is satisfactory with the addition of a third qualification: that the taxpayer's wardship status has not been terminated by the federal government. Enrollment in a tribe remaining under federal supervision satisfies this requirement as a matter of law. Persons of Indian blood who are not enrolled could also qualify for the exemption by establishing residence on the reservation and by showing that they are recognized as Indian wards by both the Indian community and by the federal government. *See, e. g.*, 25 C.F.R. §§ 20.-1(n), 261.2(e).

IV. *Remedy*

The amended complaint prays for four separate items of relief: (1) Declaratory

judgment; (2) injunction against the state preventing illegal collection of tax; (3) injunction against on-reservation employers preventing illegal withholding of tax; (4) relief in the nature of a mandatory injunction requiring the refund of taxes illegally collected beginning with tax year 1968. The decision of whether to grant the requested relief should be guided by traditional equity practices.

> The traditional view is that equitable relief is denied unless the matter is one in which equity historically developed the substantive law (as in the case of trusts), or the matter is one in which the plaintiff's remedy at law is inadequate.

*D. Dobbs, Law of Remedies* § 2.5.

 In urging dismissal of the amended complaint in this case under 28 U.S.C. § 1341, defendants unsuccessfully argued that the remedies provided in R.C.M. Title 84, Chapter 49—revision of return under § 84–4920 and claims for refund under § 84–4956—provided these plaintiffs .adequate remedies at state law.[11] Such an argument overlooks the essence of the plaintiffs' position. The plaintiffs seek to protect two different rights: the right to be free from state taxation, and the right to be free from state intrusion into Indian affairs. This duality of interest is clearly recognized in Justice Marshall's summary of the *McClanahan* holding:

> We hold that by imposing the tax in question on this appellant, the State has interfered with matters which the relevant treaty and statutes leave to the exclusive province of the Federal Government and the Indians themselves.

411 U.S. at 166, 93 S.Ct. at 1259.

While the State's protest and refund procedure are sufficient to vindicate the taxpayer's pecuniary interest, the procedure does nothing to protect the Indian taxpayer's interest as a Reservation Indian in being free from the control of state law.[12] The refund procedure implicitly presupposes that the State can intrude on an Indian's rights by collecting the tax before the remedy is made available. Under these circumstances, equitable remedies are available.

The case of *Great Lakes Dredge and Dock Co. v. Huffman*, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943), can be distinguished. The Supreme Court stated:

> Whenever the question has been presented, this Court has uniformly held that the mere illegality or unconstitutionality of a state or municipal tax is not in itself a ground for equitable relief in the courts of the United States. If the remedy at law is plain, adequate, and complete, the aggrieved party is left to that remedy in the state courts, from which the cause may be brought to this Court for review if any federal question be involved.

319 U.S. at 298, 63 S.Ct. at 1073, quoting *Matthews v. Rodgers*, 284 U.S. 521, 525–56, 52 S.Ct. 217, 76 L.Ed. 447 (1932).

Here, an injunction is necessary to preserve the rights of these plaintiffs.

Under Montana law, refunds may not be recovered "after five (5) years from the date prescribed by statute for filing the return, unless before the expiration of such period a claim therefor is filed by the taxpayer, or the department of revenue has determined the existence of the overpayment and has approved the refund or credit thereof." R.C.M. § 84–4956. Few, if any, of the plaintiffs have complied with the procedures set forth in Chapter 49, and as a result a substantial portion of the refund

---

**11.** The question was raised in the context of a motion to dismiss under 28 U.S.C. § 1341, which divests the Court of jurisdiction to enjoin collection of a state tax when the taxpayer is provided with an adequate remedy at state law. The Court did not reach the question of adequacy of remedies.

**12.** *McClanahan* establishes that treaties negotiated with Indian tribes inure to the benefit of individual Indians:

> To be sure, when Congress has legislated on Indian matters, it has, most often, dealt with the tribes as collective entities. But those entities are, after all, composed of individual Indians, and the legislation confers individual rights.
>
> 411 U.S. at 181, 93 S.Ct. at 1267.

claim here would be barred by the five-year limitation of state law if it is applicable.

■ In *Board of Commissioners v. United States*, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313 (1939), the Supreme Court considered a similar question regarding recovery by an Indian of interest on a tax refund against the State of Kansas. Kansas law disallowed recovery of interest, but the Court held this to be no bar, stating:

> The starting point for relief in this case is the Treaty of 1861, exempting [the Indian's] property from taxation. Effectuation of the exemption is, of course, entirely within Congressional control. But Congress has not specifically provided for the present contingency, that is, the nature and extent of relief in case loss is suffered through denial of exemption. It has left such remedial details to judicial implications. Since the origin of the right to be enforced is the treaty, plainly whatever rule we fashion is ultimately attributable to the Constitution, treaties or statutes of the United States, and does not owe its authority to the law-making agencies of Kansas.

308 U.S. at 349–50, 60 S.Ct. at 287–8. The rationale of *Board of Commissioners* is apposite to the case at hand. State law does not limit the relief available from the recognition of federal rights.

■ However, even though the *Board of Commissioners* Court did not feel bound by Kansas law, it did consider the law of the state to be relevant to its inquiry into the impact of the remedy on "public convenience." It concluded:

> In the absence of explicit legislative policy cutting across state interests, we draw upon a general principle that the beneficiaries of federal rights are not to have a privileged position over other aggrieved tax-payers in their relation with the states or their political subdivisions. To respect the law of interest prevailing in Kansas in no wise impinges upon the exemption which the Treaty of 1861 has

commanded Kansas to respect and the federal courts to vindicate.

*Id.* at 352, 60 S.Ct. at 289.

Thus, state law, while not binding, is relevant in fashioning an appropriate remedy here.

Montana provides a five-year limitation on claims for tax refunds, ostensibly to preclude stale claims. While the 1968 claims for which refund is sought were not stale when the lawsuit was filed in 1973, they are now. The problems associated with the processing of thousands of Indian claims, some at least ten years old, are obvious. Additionally, few of the plaintiffs attempted to secure refunds through the State. Therefore, the State's interest in an orderly tax collection procedure mandates an adherence to the State procedures as guidelines in fashioning a remedy.[13]

■ The plaintiffs' request for a prohibitive injunction to preclude on-Reservation employers from withholding state taxes is denied because of due process and sovereign immunity considerations.

■ Plaintiffs claim attorney's fees on the so-called "common fund" theory, asserting that their litigative efforts have produced a benefit for which they should be reimbursed by their fellow class members. In cases such as this, no common fund is created. Rather, a common right, in an open-ended class of plaintiffs, to recover from the State is recognized. The "common fund" theory has no application. *Townsend v. Edelman*, 518 F.2d 116, 123 (7th Cir. 1975). Since no statutory authorization for recovery of attorney's fees is presented, award of such fees must be denied. *See, Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Therefore,

IT IS ORDERED:

1. That Indian persons residing on the Crow Reservation in Montana are declared

---

**13.** Persons seeking refunds under this order will be expected to proceed through the State's tax protest and refund procedure.

to be exempt from the State of Montana's income tax laws as to income earned within the boundaries of the Crow Reservation.[14]

2. That for purposes of applying this exemption, the class of "Indian persons" on the Crow Reservation shall include persons possessing the following qualifications:

(a) that the person possess some quantum of Indian blood;

(b) that the person be recognized as an Indian by the community in which he or she lives, and that the putative taxpayer's wardship status has not been terminated by the government;

(c) that the person be an enrolled member of a federally recognized Indian tribe or otherwise eligible to be recognized as an Indian ward by the federal government.

3. That the State of Montana be, and it hereby is, enjoined from levying or collecting any tax on income herein declared to be exempt from tax.

4. That plaintiffs' request for an injunction against all on-Reservation employers of Indians residing on the Crow Reservation be, and the same hereby is, denied.

5. That pursuant to this order, the plaintiffs may collect refunds under procedures and subject to the limitations provided by State law, for any tax illegally collected.

6. That the plaintiffs' request for attorney's fees be, and the same hereby is, denied.

---

14. As applied to the stipulated subclasses, this order grants relief as to Subclasses A, C and E, and denies relief as to Subclasses B, D and F.